**Wesley HUISMAN, Appellant,**

v.

**Karen L. MIEDEMA and Larry Lee Miedema, Appellees.**

No. 00–1896.

Supreme Court of Iowa.

May 8, 2002.

Scott L. Bixenman of Murphy & Collins, P.L.C., Le Mars, for appellant.

Randy L. Waagmeester of Waagmeester Law Office, P.L.C., Rock Rapids, for appellees.

TERNUS, Justice.

Appellant Wesley Huisman, the putative father of Mark Miedema, has brought this action against Mark's mother and presumptive father, Karen Miedema and Larry Miedema, appellees, to establish that he is the biological father of Mark. The district court ruled that Huisman had waived his right to establish his paternity and this appeal followed. We agree with the district court and affirm.

### I. *Background Facts and Proceedings.*

Karen Miedema and Larry Miedema have been married since 1981. During their marriage Karen gave birth to four children, including Mark, who was born in 1992. From his birth until approximately April 1999, when Karen and Larry separated, Mark resided with Karen and Larry. He has continued to reside with Karen since April 1999.

Wesley Huisman had a nine-year affair with Karen. This liaison began in 1990 and continued until March 1999. Even though both were married to others, their relationship was intimate. Karen admits she engaged in sexual intercourse with Wesley around the time Mark was conceived.

Although neither blood nor DNA testing has been done, none of the parties dispute the likelihood Wesley is Mark's biological father. Wesley testified that Karen brought Mark to him within days after his birth and said, "This is your son." Karen also told at least one other person that Wesley was Mark's father.

Although Wesley and Karen sought to keep their relationship secret from their spouses both before and after Mark's birth, Wesley told his wife that Mark might be his son when Mark was about one year old. When Mark was almost three years old, Larry confronted Karen with his suspicion that Mark was not his biological son and Karen admitted that it was possible Wesley was Mark's father. Larry made the decision, however, not to investigate further and he parented Mark as his own child.

Karen and Wesley continued to meet clandestinely after Mark's birth. They were concerned that their children's lives not be disrupted by their affair and so had no immediate plans to divorce their spouses or tell Mark or their other children that Wesley was Mark's father. Wesley testified:

> [W]e both had young families at the time and we were in love, at least that's what she told me and I told her, and as far as my relationship with Mark, he was very young so I didn't need to—we didn't need to have an explanation for him yet at those early years. Later on we decided that rather than me say I was his father, that I would be his friend, Wes.

The evidence shows that Wesley did, in fact, have a relationship with Mark—that of friend. When Mark was a baby, Karen would bring Mark with her when she met

Wesley. Wesley gave Mark small presents, took him for rides on Wesley's farm tractor, and showed him baby animals at Wesley's farm. As Mark began to talk and the potential that he would expose their relationship to their spouses arose, Karen stopped bringing Mark to her encounters with Wesley. During this period, Karen would put Mark on the phone to talk to her "friend, Wes." On occasion, when Karen was driving somewhere, Karen would arrange to meet Wesley along the road, and Wesley would see Mark then. Sometimes Wesley would leave presents and notes for Mark in Karen's car. At Wesley's request, Karen gave Wesley pictures of Mark.

Between July 1992 and March 1999, Wesley did not provide any support for Mark in the form of housing, clothes, food or medical care. Karen never asked for monetary support and Wesley never volunteered to make regular support payments. Wesley merely advised Karen that he "would be there for whatever needs there are." At one point Wesley gave Karen $500 to buy a camcorder to take videos of Mark that could be shared with Wesley. Wesley contended that Karen used this money to pay for Mark's kindergarten tuition because she did not know how she would explain the purchase of a camcorder to her husband. Karen, however, testified that she returned the $500 to Wesley. The parties also disagreed on whether Wesley had made other payments towards Mark's preschool tuition. (We assume for purposes of this appeal, that the disputed payments were made.) During this period Wesley provided no physical care or supervision of Mark.

In March 1999, Karen ended her affair with Wesley and began a relationship with another man. Shortly thereafter, Karen moved out of her marital home, taking Mark and her daughter with her, and filed for divorce. For a few months thereafter, Wesley's contacts with Mark increased. Karen allowed Mark to go with Wesley and Wesley's son, Wade, on a fishing trip and to go on occasional plane rides with Wesley. On one occasion, Karen left Mark with Wesley while she conducted an insurance physical. Wesley and Mark worked on a go-cart together during this time and Wesley attended Mark's baseball games. After Karen left the family home, Wesley began making $200 monthly support payments to her until October 1999, when she refused to accept them.

Although Karen, Wesley and their spouses knew that Wesley might be Mark's biological father, prior to December 1999 no one took any steps to challenge Larry's status as the established father. *See generally* Iowa Code § 252A.3(4) (1999) (providing that child born to a married woman is deemed to be the child of mother and her husband). Wesley claimed that he did not assert his parental rights because he thought that eventually he, Karen and Mark would be together as a family and because Karen told him he had no legal rights regarding Mark. Wesley admitted he undertook no independent inquiry into his rights by consulting with an attorney.

Wesley was finally prompted to see an attorney when Karen asked him in October 1999 to take a blood test to prove he was Mark's biological father. (Karen wanted to use this information to thwart Larry's attempt to obtain custody of Mark.) At about this same time, Karen denied Wesley any further contact with Mark and began to return presents Wesley purchased for Mark.

On December 27, 1999, Wesley filed a petition to overcome Larry's paternity and to establish custody, visitation and support. Karen and Larry resisted, asserting that Wesley had waived his rights by fail-

ing to take any action to enforce them or to assume responsibility for Mark's support, maintenance, and care. The parties agreed to try the issue of waiver prior to resolving paternity. After an evidentiary hearing, the district court ruled that Wesley had waived his rights, so the court dismissed his petition. Wesley filed this appeal.

## II. *Scope of Review.*

Although the parties seem to think our review is for correction of errors of law, we disagree. The right that Wesley was found to have waived is a constitutional right, as our subsequent discussion shows. Therefore, our review is de novo. *State v. Hallum*, 606 N.W.2d 351, 354 (Iowa 2000) ("Because the defendant's alleged forfeiture involves a loss of the constitutional right to confront his accusers, our review is de novo."). *See generally Callender v. Skiles*, 591 N.W.2d 182, 185 (Iowa 1999) (holding that review of constitutional claims is de novo).

## III. *Issues on Appeal.*

■ To put the issues on appeal in context, we begin with a statement of the general definition of waiver: "waiver is an intentional relinquishment of a known right." *Hallum*, 606 N.W.2d at 354. Wesley contends that his conduct does not satisfy this definition for two reasons. First, he claims his right to contest the paternity of a presumed father and establish his own paternity was not "known" prior to our 1999 decision in *Callender v. Skiles*. Second, he asserts that whether he waived his rights should not depend on his success in establishing a parent-child type of relationship with Mark, but on his efforts to maintain contact with the child. We will address each argument separately.

## IV. *Was the Right Wesley is Claimed to Have Waived a* Known *Right?*

■ In order to address Wesley's first argument, the nature of the right claimed to be waived must be identified. Two cases are pertinent to this inquiry: *In re B.G.C.*, 496 N.W.2d 239 (1992), and *Callender*. We first discuss *In re B.G.C.*

In *In re B.G.C.*, this court held that "[t]he interest of parents in their relationship with their children is a fundamental liberty interest protected by the Fourteenth Amendment." 496 N.W.2d at 244. In that case, we examined whether the procedures provided under chapter 600A for the termination of an unmarried mother's parental rights with respect to her child comported with due process. *Id.* We held that they did. *Id.* We also ruled in *In re B.G.C.* that the putative father had not abandoned the child so as to permit termination of his parental rights. *Id.* at 246.

Subsequently, this court considered a similar issue in *Callender*. In that case, a putative father sought to establish his paternity of a child born to a woman married to another man. 591 N.W.2d at 184. Relying in part on our decision in *In re B.G.C.*, we recognized that the putative father had a protected liberty interest in his relationship with his biological child. *Id.* at 190–91. We held that under the Iowa Constitution this interest could not be infringed without first providing due process. *Id.* at 190. We concluded that the putative father was entitled to petition the court to overcome the presumptive father's paternity and establish his own paternity, using the procedures set forth in chapter 600B. *Id.* at 192. We noted, however, that a parent could waive his right to challenge an established father's paternity. *Id.*

Wesley claims that he cannot be held to have waived his right to challenge Larry's paternity and establish his own because his due process rights were unknown prior to

our decision in *Callender*. We think, however, that the right he was found to have waived is *substantive* in nature; it is the parent's fundamental liberty interest in establishing a relationship with his or her child, recognized by this court in *In re B.G.C.* The *Callender* decision merely established a *procedural* mechanism for putative fathers to assert their parental rights.

Our analysis is consistent with this court's brief discussion of waiver in *Callender*. In that case, we implied that waiver could occur if the parent had not demonstrated "a serious and timely expression of a meaningful desire *to establish parenting responsibility*." *Id.* (emphasis added). We relied on a Texas case that required a parent to "acknowledge responsibility for child support or other care and maintenance, and make[ ] serious and continuous efforts to establish a relationship with the child." *Id.* (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Clearly, our court was focusing on the father's effort to exercise his parental rights, not his efforts to judicially enforce those rights. That is not to say that the timeliness of attempts to judicially enforce parental rights might not be relevant to whether the putative father has waived his liberty interest. But the primary focus in such cases should be on whether the parent has waived his substantive interest in having a relationship with his child, not on whether he has waived his procedural remedies.

Given the fact that this court recognized a natural father's "fundamental liberty interest" in his relationship with his child in 1992 in our *In re B.G.C.* case, 496 N.W.2d at 244, Wesley's protected interest with respect to his putative child was known or knowable shortly after Mark was born. (Mark was born in July 1992 and our decision in *In re B.G.C.* was issued in September 1992.) Thus, it is appropriate to examine Wesley's conduct to determine whether he made "a serious and timely expression of a meaningful desire to establish parenting responsibility" for Mark, or whether he intentionally relinquished this responsibility. *Callender*, 591 N.W.2d at 192.

## V. *Did Wesley Waive his Liberty Interest in Having a Relationship With Mark?*

█ Before we look at the facts of this case, we must define the nature of the efforts required by a putative father to avoid a waiver of his rights. Wesley argues that efforts by a parent to maintain consistent contact with his child are sufficient even though the association is not of a parent/child nature. We disagree.

Certainly, the import of our brief discussion of waiver in *Callender* implied that the efforts made by a putative father to assert his rights must be parental in character. As noted earlier, we observed in *Callender* that a parent who did not make "a serious and timely expression of a meaningful desire to establish *parenting* responsibility" could lose his rights. *Id.* (emphasis added).

This focus is consistent with the nature of the liberty interest at stake here. The liberty interest at issue is not merely to know the child, to visit with the child, and to give the child gifts. The interest at stake is based on the "significance of the *biological* link." *Id.* at 190 (emphasis added). It is "[t]he right of a *parent* to companionship, care, custody, and management of his or her children." *Id.* (emphasis added).

To require anything less than efforts to establish a *parental* relationship would be inconsistent with our case law in other situations involving child custody. For example, in *In re Guardianship of Knell*, 537 N.W.2d 778 (Iowa 1995), this court affirmed an award of custody of a minor

child to the child's stepfather over the objection of the child's biological father. 537 N.W.2d at 783. We held that the natural father was not entitled to custody of his daughter after the child's mother died because the father had made a voluntary and conscious choice to permit the stepfather to raise the child as his own. *Id.* Because the father had taken " 'an extended holiday from the responsibilities of parenthood,' " we held that he could not take advantage of the statutory preference for parental custody. *Id.* at 782 (citation omitted).

Similar sentiments were expressed by the United States Supreme Court in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In that case the Court held a natural father's constitutional rights were not violated when he was not given notice of his child's adoption because he had "never had any significant custodial, personal, or financial relationship" with the child. *Lehr*, 463 U.S. at 262, 265, 103 S.Ct. at 2994–95, 77 L.Ed.2d at 627, 629. Holding that the federal constitutional protection of paternal rights depended on "a full commitment to the responsibilities of parenthood," the Court determined that for the natural father to have qualified for such protection, he should have " 'come forward to participate in the rearing of his child.' " *Id.* at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626 (citation omitted). The Court said,

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for his child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a

State to listen to his opinion of where the child's best interests lie.

*Id.* at 262, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 627.

Turning to the facts of the present case, we agree with the district court that Wesley did not make adequate efforts to assume parental responsibility for Mark. Although he established a friendship with Mark, he made no attempt to exercise responsibility for Mark's care or custody. Not until Mark was seven years old did Wesley make regular child support payments; prior to that time, Wesley was satisfied to give Mark small gifts and trinkets. When asked at the hearing about the arrangement Wesley had with Karen to simply be Mark's friend and not to reveal that he was Mark's father, Wesley responded,

> *[E]ventually* he was going to be my son, but at the time he was very young and he lived at home with Larry and Karen and *Larry was his father*, so a little … four, five, six-year-old boy doesn't understand and so I was his friend, Wes.

(Emphasis added.)

For more than seven years, Wesley was content to let another man raise a child that was possibly his own. He did so, not through a lack of success at asserting his parental rights, but because it served his own need to keep his affair with Mark's mother a secret. Wesley's actions in 1999 in paying support and in commencing this action were too late. The district court correctly found that he had waived his liberty interest in a parental relationship with Mark. Accordingly, Wesley has no enforceable right to assert in the present action and the case was properly dismissed.

**AFFIRMED.**