Daniel T. BOONE, Appellant,

v.

Kelly Wayne BALLINGER, Melinda Dee Ballinger, Appellees.

Melinda Dee Ballinger and Daniel T. Boone, Appellants,

v.

Kelly Wayne Ballinger, Appellee.

Nos. 2006–CA–001257–ME, 2006–CA–001287–ME.

Court of Appeals of Kentucky.

May 4, 2007.

Rehearing Denied July 3, 2007.

Sheryl Egli Heeter, Covington, KY, for appellant Daniel T. Boone.

James Kruer, Covington, KY, for appellant Melinda Dee Ballinger.

Mark A. Ogle, Ft. Mitchell, KY, Tasha K. Scott, Covington, KY, for appellee Kelly Wayne Ballinger.

Before ABRAMSON and STUMBO, Judges; KNOPF,[1] Senior Judge.

## OPINION

ABRAMSON, Judge.

This case painfully illustrates the family turmoil and legal morass created when a child born *during* a marriage is not a child *of* the marriage. Several months into dissolution proceedings, Kelly Ballinger learned for the first time that the two youngest children born during his fifteen-year marriage to Melinda Ballinger were not his biological daughters. The trial court concluded from the evidence in the record that Kelly had been a devoted father to the three-year-old and six-year-old girls, performing the majority of the everyday tasks related to their upbringing and essentially serving as their primary

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5) of the Kentucky Constitution and KRS 21.580.

parent. When the parties' marriage came to an end, the trial judge found herself in uncharted waters as she sought to sort out the legal relationships of Kelly, Intervening Petitioner Daniel Boone (the girls' biological father), and the two young girls themselves who had known no father other than Kelly. Confronted with certified DNA results that established that Boone was the biological father, Kelly sought *de facto* custodian status, relying on his central parenting role throughout their lives. The trial court concluded, after an evidentiary hearing, that Kelly was indeed the *de facto* custodian and further that Boone and Melinda were estopped from denying that Kelly was the legal father of the girls.

After considering the issues raised by Boone and Melinda on appeal, we are compelled to reverse and remand to the trial court. While Kelly does not qualify for *de facto* custodian status under Kentucky law, Boone's conduct may preclude him from displacing Kelly altogether in the girls' lives. Even after the adoption of the *de facto* custodian statute, Kentucky courts continue to recognize the applicability of the doctrine of waiver in a child custody dispute. Accordingly, on remand the trial judge should address whether Boone has waived the typically superior custody rights of a biological father. As for the trial court's conclusion that Boone and Melinda were estopped from disputing that Kelly is the legal father of the girls, the doctrine of paternity by estoppel adopted in *S.R.D. v. T.L.B.*, 174 S.W.3d 502 (Ky. App.2005), would not apply so as to estop Boone and Melinda from seeking a paternity determination. Finally, as to Melinda's 401(k) retirement account, we agree that the trial court erred in deeming it marital property without considering Kentucky Revised Statute (KRS) 403.190(4). Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## RELEVANT FACTS AND PRIOR PROCEEDINGS

Kelly and Melinda married on November 12, 1988. Their two sons were born in 1989 and 1994. In February 1998, the older of the two girls was born. Her younger sister was born three years later in 2001. During the Ballingers' marriage, Kelly was employed as a high school teacher while Melinda was employed as a bookkeeper for a refrigeration company. Kelly's income was higher than Melinda's, and his work schedule was more flexible. As revealed in the record, the latter fact resulted in Kelly performing the majority of the day-to-day tasks related to the upbringing of the four children. For example, he woke up the girls every morning, bathed them and prepared their breakfasts. He drove them to doctor appointments when they were ill and was present for every well visit. He attended every sporting event, practice, music recital or other extra-curricular activity. Even though Melinda was also involved, Kelly performed the majority of the household chores and other tasks related to the raising of the children.

Meanwhile, in 1997, Melinda had begun having an extra-marital affair with Daniel T. Boone. Boone, Melinda's boss at the refrigeration company, was a friend of the family and the godfather of the older girl. Though Melinda and Boone did not know with certainty that Boone was the girls' biological father before genetic tests were performed in March 2004, they both have acknowledged that when Melinda became pregnant with each girl they realized that such a possibility existed. Despite this awareness, prior to the 2004 testing conducted during dissolution proceedings, neither took any steps to learn the truth and they continued to allow Kelly to believe

that he was the father of the girls and to act in that role.

Despite the length and nature of her relationship with Boone as well as the lingering question of the girls' paternity, Melinda repeatedly denied that she was having an affair when Kelly questioned her about what he believed was her suspicious or improper conduct. Their marital relationship continued to deteriorate and Melinda initiated divorce proceedings on September 18, 2003. Even after the filing of her petition, and until May 2004, Melinda and Kelly continued to reside together in the family home so that they could care for the four children. Unbeknownst to Kelly and upon the advice of Melinda's counsel, Melinda and Boone had paternity tests conducted. In March 2004 they learned that these tests proved that Boone, and not Kelly, is the girls' biological father. Kelly was completely unaware of this fact until, at an April 27, 2004 *pendente lite* hearing, Melinda's counsel informed Kelly's counsel, who then told Kelly.

On January 25, 2005, Boone intervened in the Ballingers' divorce action to assert a claim for custody of the two girls. Kelly testified that because he feared Boone's claim, if granted, would result in his being excluded from the lives of the two girls he considered to be his daughters, he responded on February 18, 2005 with his own counterclaim against both Melinda and Boone in which he sought a legal determination that he was the girls' *de facto* custodian pursuant to KRS

403.270(1).[2] Melinda, who is now married to Boone, aligned herself with Boone to contest Kelly's claim.

On October 28, 2005, a hearing was held on Kelly's claim of *de facto* custodian status. Kelly, Melinda and Boone were all present and testified. In its written Amended Findings of Fact, Conclusions of Law and Custody Supplemental Judgment entered on May 18, 2006,[3] the trial court recited Kelly's years of offering love and support to the girls, as well as the many parental duties he performed. The trial court then found that he had been "the only 'Father' that these four children had known in their lives" and noted that he had always been the primary financial provider for the children and continued to be even during the divorce proceedings. As a result, the trial court found that the evidence was clear and convincing that Kelly, "having met all the requirements of KRS § 403.270, is . . . the de facto custodian" of the girls and "shall have the same standing in this custody matter that is given to a natural parent." With respect to Boone, the trial court found that "while apparently a biological parent, [he] never fulfilled any parental duties or acted as a natural parent prior to the commencement of this action but rather relinquished custody of the children to [Kelly] and [Melinda]."

After referring to this Court's prior decision in *S.R.D. v. T.L.B.*, 174 S.W.3d 502 (Ky.App.2005), the trial court then held:

---

2. Kelly's counterclaim also seeks damages for intentional infliction of emotional distress. In addition, Kelly argues that if the trial court were to determine that he was not the *de facto* custodian, he should be entitled to *quantum meruit* damages from Boone for the services he rendered in raising the two girls while Boone took no action to ascertain his own paternity rights.

3. The trial court entered its original Findings of Fact and Conclusions of Law and Custody Supplemental Judgment on December 28, 2005. However, because it contained at least one error and the parties sought clarification of certain provisions therein, the trial court entered amended findings on May 18, 2006. We refer to the amended findings herein because that is the final judgment of the trial court and is the judgment from which the parties appealed.

[Melinda], by her words, her actions and also by her silence, concealed the fact that she conceived the minor children by someone other than [Kelly]. [Melinda] knew that [Kelly] may not be the biological parent of the girls. [Kelly] did not know that anyone other than himself was the biological parent of the girls. [Melinda], in concealing her relationship, and as evidenced by the early pleadings in this case, acted with the intention that [Kelly] would raise the two girls as his own, and with their two older children. [Kelly] relied upon [Melinda's] assertions, words and silence, to his detriment. Thus, [Melinda] is equitably estopped from asserting that [Kelly] is not the legal father of the two minor girls.

Mr. Boone, by his actions and also by his silence, concealed the fact that the minor children were the result of his relationship with [Melinda]. Mr. Boone knew that [Kelly] may not be the biological parent of the girls. [Kelly] did not know that anyone other than himself was the biological parent of the girls. Mr. Boone, in concealing his relationship with [Melinda], acted with the intention that [Kelly] would raise the children as his own. [Kelly] relied upon Mr. Boone's assertions and silence, to his detriment. Thus, Mr. Boone is equitably estopped from asserting that [Kelly] is not the legal father of the two minor girls.

The trial court concluded by adjudging Kelly "the de-facto [sic] parent of [the two girls]" and denying what she referred to as "Daniel T. Boone's counterclaim for custody and visitation."

Melinda and Boone have appealed this order. Additionally, Melinda has appealed the trial court's decision that her 401(k) retirement account is marital property subject to division between the parties.

## PATERNITY—BIOLOGICAL AND LEGAL

■ At the outset, we note that Kentucky law provides that a child born during a marriage "is presumed to be the child of the husband and wife." KRS 406.011. Though the presumption is rebuttable, it can be overcome only in a paternity action brought in district court pursuant to Kentucky's Uniform Act on Paternity (UAP), KRS 406.005 *et seq.*[4] At the oral arguments held in this matter, counsel for both Melinda and Boone claimed that the two had entered into an agreed judgment of paternity in Kenton District Court. Kelly's counsel, however, denied any knowledge of such a paternity action. Because no party has supplemented the record in this Court with any documents from the alleged paternity action, it is unclear as to whether Boone or Kelly is currently the girls' legal father. Nonetheless, because (as all parties appear to accept) the certified DNA testing performed in this case makes the result of any paternity action a foregone conclusion,[5] the same custody and

---

4. A paternity determination may be made "upon the complaint of the mother, putative father, child, person, or agency substantially contributing to the support of the child." KRS 406.021(1). The UAP does not define "putative father" but "putative" is defined in *Webster's II New College Dictionary* as "regarded as such; supposed." Even if the term "putative father" is construed to apply only to Kelly, Melinda, now married to Boone, clearly has standing to bring a paternity action.

5. In at least one state, the statutory presumption of legitimacy which attaches to the mother's husband and the statutory presumption accorded the biological father are deemed competing presumptions, with paternity decided in the best interests of the child. *N.A.H. v. S.L.S.*, 9 P.3d 354 (Colo.2000). Kentucky has a genetic testing presumption, KRS 406.011, as well as the marital presumption but case law reflects that paternity determinations are a function of biological connec-

visitation issues which the trial court has dealt with must inevitably be addressed regardless of the status of any paternity action which Melinda or Boone may have already commenced. The interest of judicial economy and, more importantly, the interest of the children involved are best served by addressing these unavoidable issues at this time. We begin with the Solomon-like task which confronted the trial court, the legal relationship of Kelly to the two young girls who bear his name and have been raised as his daughters.

 Under American law, a biological parent's interest in his or her child is a powerful one that will not be disturbed "absent a powerful countervailing interest...." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Indeed, the rights of a parent to the care, custody and companionship of a minor child are "far more precious ... than property rights." *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). Despite the exalted place that such rights hold, the law also recognizes that there are circumstances where a biological parent's rights are diminished or even forfeited due to his actions (or inaction) or due to legislative policy.

 In *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court held that a biological father who had never established a relationship with his two-year-old child, born out-of-wedlock, was not deprived of due process or equal protection rights when the child was adopted by the mother's husband in proceedings of which the biological father did not receive notice and in which he did not participate. As to the due process issue, the Supreme Court stated:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds....

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Id.* at 261–62, 103 S.Ct. 2985 (internal quotation marks and citations omitted). As to the equal protection issue, the *Lehr* Court stated:

> If one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not pre-

tion to the child. 16 L. Graham & J. Keller, *Kentucky Practice—Domestic Relations Law* § 23.4 (2d ed.1997). *See Bartlett v. Comm. ex rel. Calloway*, 705 S.W.2d 470, 473 (Ky.1986) (HLA testing allowed to prove child born during marriage was fathered by someone other

than the husband; "When the advances of science serve to assist in the discovery of truth, the law must accommodate them. The law cannot pick and choose when the truth will prevail.").

vent a state from according the two parents different legal rights. *Id.* at 267–68, 103 S.Ct. 2985. Even where a biological father has established a relationship with his child, his rights may be curtailed by statutes designed to preserve the "integrity of the family unit." *Michael H. v. Gerald D.,* 491 U.S. 110, 119–20, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1991). In *Michael H.,* the United States Supreme Court held that a biological father's procedural and substantive due process rights were not violated by a California statute creating a conclusive presumption that a child born during marriage was a child of the marriage. The presumption was unassailable unless either the husband or wife raised the issue of paternity within two years of the child's birth. The mother/wife had remained with her husband and was unwilling to pursue the paternity issue so the biological father had no viable means of raising the issue except by constitutional challenge to the presumption. Noting with approval the California appellate court's observation that the presumption was actually "a substantive rule of law based upon a determination by the Legislature as a matter of overriding social policy", 491 U.S. at 119, 109 S.Ct. 2333, the Supreme Court held:

> Where ... the child is born into an extant marital family, the natural father's unique opportunity (to develop a relationship with his offspring) conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter.

*Id.* at 129, 109 S.Ct. 2333. With this constitutional backdrop, we turn to Kentucky law, beginning with the *de facto* custodian statute.

### DE FACTO CUSTODIAN STATUS

■ After learning that he was not the girls' biological father, Kelly sought judicial recognition as their *de facto* custodian. The statute setting forth the requirements for *de facto* status is found at KRS 403.270. This statute permits someone who has acted as a child's primary caregiver to be deemed the *de facto* custodian of the child, thereby allowing him to stand on an equal footing with the child's biological parents in matters such as custody determinations. *See e.g.* KRS 405.020(3) (court may grant legal custody to *de facto* custodian in lieu of natural parents if in the best interests of the child). Subsection (1) of KRS 403.270 provides:

> (a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department of Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

> (b) A person shall not be a de facto custodian until a court determines by clear and convincing evidence that the person meets the definition of de facto custodian established in paragraph (a) of this subsection. Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section and KRS 403.280, 403.340, 403.350, 403.822, and 405.020.

On appeal, Melinda and Boone challenge the trial court's application of this statute and its resulting conclusion that Kelly is the girls' *de facto* custodian. The record is clear that from a factual standpoint, it is beyond dispute that at all times from the girls' births until after the initiation of dissolution proceedings Kelly believed that he was their father and acted accordingly. Conversely, during this same period of time, Boone assumed *no* parental duties, refusing even to pursue the issue of whether he might be the biological father of one or both of the girls despite his awareness of that possibility. Relying on this Court's previous decision in *Consalvi v. Cawood,* 63 S.W.3d 195 (Ky.App.2001), Melinda and Boone argue that the trial court should have denied Kelly *de facto* custodian status as a matter of law. They contend KRS 403.270 was unavailable to Kelly since he was not the sole caregiver for the two girls but rather provided for them "alongside the natural parent (Melinda)." *Id.* at 198. We agree.

In *Consalvi,* an ex-husband, Cawood, sought to be named the *de facto* custodian of two children that were not his biological offspring. The older child was born one month prior to the parties' marriage. The younger one was born following a period of separation during which time Consalvi, the mother, had been involved with another man. The parties disputed whether Cawood was aware that he was not the natural father of the children. The trial court ordered joint custody because the children had established a relationship with Cawood and the court found that it would be in their best interests to continue that relationship. In order to craft this result, the trial court found Cawood to be the children's *de facto* custodian pursuant to KRS 403.270 despite the fact that Consalvi also contributed to their care. On appeal, this Court reversed the trial court's deci-

sion and ruled that Cawood could not be the *de facto* custodian.

> The statute requires that a person be "the primary caregiver for, and financial supporter of, a child ... for a period of one (1) year or more...." The court held that Cawood was "a primary caregiver" for the children, but did not find that he was "**the** primary caregiver." ... We are bound by the plain language of the statute, and words not defined must be given their ordinary meanings. In this case, it is clear that the statute is intended to protect someone who is the primary provider for a minor child in the stead of a natural parent; if the parent is not the primary caregiver, then someone else must be. The de facto custodian statute does not, contrary to Cawood's position at oral argument, intend that multiple persons be primary caregivers. The court's finding that he was "a primary caregiver" and "a financial supporter" is not sufficient to establish that he was indeed "**the** primary caregiver" within the meaning of the statute.

*Consalvi, supra* at 197–98 (emphasis in original). The Court concluded that "it is not enough that a person provide for a child alongside the parent" but rather he must "literally stand in the place of the natural parent." *Id.* at 198.

Applying this authority to the matter now before us, we agree with Melinda and Boone that Kelly is not eligible for *de facto* custodian status. However, we also recognize that an inconsistency exists between *Consalvi* and the doctrine of paternity by estoppel that was adopted in *S.R.D., supra,* a 2005 decision of this Court relied on by the trial court in this matter. In the latter case, a married father who thought a child born during the marriage was his, and who treated her so, was estopped from denying paternity so as to avoid post-divorce child support obligations. Simply

put, *S.R.D.* precludes a "misled husband" from severing the father-child bond simply because he is proven not to be the biological father. The focus of "paternity by estoppel" is on the child and the parent-child relationship that has developed. On the other hand, *Consalvi* holds that a man who provides care and financial support alongside the mother cannot acquire *de facto* custodian status so as to maintain a father-child bond after the parties' divorce.[6] This result, of course, completely ignores the parent-child relationship that may have developed, a relationship which *S.R.D.* considered paramount. The real problem with the decidedly inconsistent approaches in *Consalvi* and *S.R.D.* is the one clearly exposed in this case. Where a child is born nine or more months after a marriage, the husband is perfectly justified in assuming that he is the father of the child. Years later, as the marriage dissolves and the question of paternity is raised, he may want to remain in the child's life and provide care and support, but *Consalvi* instructs that he cannot be a *de facto* custodian because he provided the care and support alongside the biological mother who married him. Therein lies the irony: if a misled husband decides to "run" in order to avoid any parental support obligations, he would be prohibited from doing so by *S.R.D.* and would remain financially bound to the child, but should he desire to "stay" and maintain a relationship with the child, *Consalvi*, literally applied, says that he cannot be the *de facto* custodian and is not entitled to custody or visitation. Fortunately, a man who was led to believe he is the father of a child born during his marriage may be able to maintain a relationship with the child in those instances where the biological father has waived his superior right to custody.

## WAIVER OF A BIOLOGICAL PARENT'S SUPERIOR CUSTODIAL RIGHTS

The *Consalvi* Court held that previous appellate decisions in Kentucky applying the traditional doctrine of waiver in custody disputes between a "natural parent" and a non-parent "were superseded by the amendment of KRS 403.270(1)." *Consalvi,* 63 S.W.3d at 198. Subsequent decisions by the Kentucky Supreme Court have implicitly overruled that portion of *Consalvi.* In *Moore v. Asente,* 110 S.W.3d 336 (Ky. 2003), a child's biological parents, who had voluntarily agreed to terminate their parental rights prior to adoption proceedings, sought to regain custody of the child before the adoption was finalized. In addressing the circumstance in which a non-parent may seek custody of a child, the Supreme Court stated:

> Custody contests between a parent and a nonparent who does not fall within the statutory rule on "de facto" custodians are determined under a standard requiring the nonparent to prove that the case falls within one of two exceptions to parental entitlement to custody. One exception to the parent's superior right to custody arises if the parent is shown to be "unfit" by clear and convincing evidence. A second exception arises if the parent has waived his or her superior right to custody.

*Moore v. Asente,* 110 S.W.3d 336 (Ky. 2003), *quoting* 16 L. Graham & J. Keller, *Kentucky Practice—Domestic Relations Law* § 21.26 (2d ed. West Group 2003 Pocket Part). Approximately one year la-

---

6. If the man knows his true status (*i.e.,* that he is not the biological father) he essentially assumes a step-parent role from the outset because he is fully aware that he is raising another man's child. In that circumstance, there is some logic in concluding that he should not thereby expect to be treated as the child's father post-divorce.

ter, the Supreme Court once again revisited the question of how a non-parent may challenge a parent's superior right to custody of a child. In *Vinson v. Sorrell*, 136 S.W.3d 465 (Ky.2004), a child's maternal grandparents sought custody of their grandchild following the death of the child's mother. Though they were not *de facto* custodians, they contended that the father had waived his otherwise superior custody right through his conduct. The Supreme Court ultimately agreed with this Court that, while waiver could apply, the trial court's decision that the father had waived his superior right was not supported by clear and convincing evidence. In doing so, the Court reiterated the principle that a non-parent who does not meet the statutory standard of *de facto* custodian may pursue custody if there is clear and convincing evidence that the parent is either unfit *or* has waived his or her superior custody rights. *Id.* at 468.

■ From these precedents, it is apparent that the concept of waiver remains alive and well in a custody dispute between a non-parent and a parent in situations where the non-parent cannot qualify as a *de facto* custodian yet the parent's conduct warrants a finding of waiver, allowing the non-parent to then be considered for custody. Traditionally, waiver of a parent's superior custodial right has been recognized in two distinct scenarios. The first involves a biological mother or father's claim of custody as against the putative adoptive parents appurtenant to adoption proceedings, *Moore v. Asente, supra; Van Wey v. Van Wey*, 656 S.W.2d 731 (Ky. 1983); *Boatwright v. Walker*, 715 S.W.2d 237 (Ky.App.1986), and the second involves a dispute between a known natural father and another member of the child's extended family, *Vinson, supra* (father versus child's maternal grandparents); *Greathouse v. Shreve*, 891 S.W.2d 387 (Ky.1995) (father versus child's maternal grandmoth-

er). This case presents a third factual scenario to which the doctrine of waiver is equally applicable, *i.e.*, waiver of a biological father's custodial right as against the husband to whom the mother was married when the child was born and who has been led to believe that he *is* the child's father. Recognition of the applicability of waiver in such circumstances is not only legally justified, but necessary, in order to prevent the harm that inevitably results from the destruction of the bond that develops between a "psychological father" and a child who was born during his marriage, and who has been raised as his own daughter or son.

■ Addressing the issue of waiver, Boone maintains it cannot apply because waiver necessarily entails a knowing and voluntary surrender of a known right. He claims no waiver could occur until he knew the girls were actually his biological daughters. We disagree. Although Boone did not know with certainty his genetic relationship to the girls prior to the testing, both he and Melinda have acknowledged that they were well aware of the possibility at the time each child was born. Under similar circumstances, where a man knew he was potentially the biological father of a child born during the mother's marriage to another man but did nothing to address the issue, the Supreme Court of Iowa held that he waived any interest in a parental relationship with the child. *Huisman v. Miedema*, 644 N.W.2d 321 (Iowa 2002). In that case, as here, the child knew his biological father as simply a friend. Nevertheless, the Iowa court observed that "[he] was content to let another man raise a child that was possibly his own" and, by his conduct, "waived his liberty interest in a parental relationship." *Id.* at 326. In the case before this Court, we are *not* concluding that Boone has waived his right to a *parental relationship*

with the girls but rather that on remand the trial court should determine whether Boone has waived the *superior custodial rights* customarily accorded a biological parent.

Emphasizing that the girls were always in their mother's custody, Boone also seeks to forestall application of the waiver doctrine by citing *B.F. v. T.D.*, 194 S.W.3d 310 (Ky.2006) for the proposition that waiver can only apply if the children are not in either parent's physical custody. *B.F.* involved a same-sex couple, one of whom adopted a child who was then raised by both of them. There was no marital dissolution involved when the couple discontinued their relationship so the non-adopting partner tried to establish her *de facto* custodian status. She was unsuccessful and the trial court held that she had no standing to pursue custody. This Court and the Kentucky Supreme Court affirmed, citing KRS 403.260(4) (repealed in 1980) which limits standing to initiate a custody proceeding to the parents and those who have physical custody of the child. The Supreme Court also concluded that waiver cases, such as *Moore v. Asente*, would not confer standing on B.F. because they involved children who were not in the physical custody of either parent, a fact not present in B.F.'s case. *B.F.* does not, however, preclude application of waiver in this case. Unlike the domestic partner in *B.F.* who had no standing to initiate a custody proceeding and thus place the issue before a court, Melinda placed the custody issue before the trial court when she filed for dissolution; she and Kelly were parties to the proceeding as the girls' parents and Boone, deemed a "necessary party" by the trial court, was allowed to intervene. At that juncture, all three adults were properly before the court and the "issue of waiver [was] relevant ... to the standard required to gain custody." *B.F.*, *supra* at 312.

Having concluded that waiver is applicable in this case, we note that the factors relevant to determining generally whether a parent has waived his or her superior custody right were set forth in *Vinson*, *supra*. These factors include:

[the] length of time the child has been away from the parent, circumstances of separation, age of the child when care was assumed by the non-parent, time elapsed before the parent sought to claim the child, and frequency and nature of contact, if any, between the parent and the child during the non-parent's custody.

*Id.* at 470; *see also* Justice Spain's concurring opinion in *Shifflet v. Shifflet*, 891 S.W.2d 392 (Ky.1995). All of these factors are invariably present in a "misled husband" scenario. Indeed, the trial court in this case assessed many, if not all, of these same factors in the course of addressing Kelly's *de facto* custodian claim. However, because the trial court did not review the evidence before her in terms of whether Boone clearly and convincingly waived his superior custodial rights, but rather only in the context of whether Kelly was the girls' *de facto* custodian, we must reverse the trial court's judgment and remand for such further proceedings, as the trial judge may deem necessary, to address the issue of waiver. If the trial court concludes that Boone has waived his superior custodial rights, custody must then be determined based on the girls' best interests. *Moore v. Asente*, *supra*.

### THE INAPPLICABILITY OF PATERNITY BY ESTOPPEL

We turn next to the trial court's decision to estop Melinda and Boone from challenging that Kelly is the legal father of

the two girls.[7] Again, we must preface our discussion with a recognition that, under Kentucky law, Kelly *is* the legal father of the girls until such time as a judgment of paternity in Boone's favor is entered by an appropriate court.[8] According to KRS 406.021, jurisdiction over paternity determinations lies exclusively with the district court. Thus, the circuit court lacked jurisdiction to render a paternity judgment— the practical result of denying Boone and Melinda the right to seek a judgment of paternity for the Ballinger girls. Additionally, despite the trial court's ruling to the contrary, even if the matter of paternity (*i.e.*, determining the identity of the girls' *legal* father) was properly before the trial court we can find no authority in KRS Chapter 406 or elsewhere supporting the application of the doctrine of estoppel to bar a biological father from seeking a declaration of paternity in an action authorized under that chapter.

The trial court relied on *S.R.D. v. T.L.B.* in estopping Boone and Melinda from challenging Kelly's legal father status. However, as discussed above, that case involved estopping a husband from severing a parental relationship with a daughter born during his marriage who was eventually determined not to be his biological child. Although that case had the same "misled husband" scenario as this case, estoppel was employed to preserve the relationship (both emotional and financial) between the child and the only father she

had ever known *not* to sever the biological father's rights to establish his genetic connection to the child.

Moreover, if a biological father is to be precluded from establishing *any* legal relationship to his child born during the mother's marriage to another man, or if he is to be limited in his options, we believe that such preclusion or limitation must be established by our legislature. In *Michael H., supra,* the California legislature precluded the biological father from acquiring any legal parental rights through the conclusive presumption at issue. In that case, the United States Supreme Court stated that it was "a question of legislative policy and not constitutional law whether California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted." 491 U.S. at 129–30, 109 S.Ct. 2333. Furthermore, while the Uniform Parentage Act (2000), adopted in some states, allows the biological father standing to bring a paternity action to rebut the presumption of paternity as to a child born during a marriage, it does so only if he commences the action within two years of the child's birth. Section 607. An earlier version of that same Uniform Act allowed a paternity action regarding a child born during a marriage to be brought "within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five years after the child's birth." Uniform Parentage Act (1973),

---

7. Unlike some states, Kentucky does not have statutory definitions that describe "legal" fatherhood. The Termination of Parental Rights chapter, KRS Chapter 625, simply refers to "biological parents" and the "putative father". The UAP, KRS Chapter 406, refers to "father" and "alleged father", neither of which is defined. The Parent and Child chapter, KRS Chapter 405, refers to "father" without definition. KRS Chapter 403, regarding Dissolution of Marriage—Child Custody, contains no definition of "father". Case law sup-

ports the conclusion that in cases such as this a child's legal father is the husband of the marriage into which the child was born unless a different paternity has been formally adjudicated.

8. In fact, though the record before this Court is silent on the issue, Melinda and Boone contend that a district court judgment of paternity in favor of Boone has already been entered.

Section 6(a)(2). The Kentucky General Assembly has not adopted either Uniform Act or any other statutory mechanism curtailing the legal rights of a biological father where his child is born during the mother's marriage to another man. While the courts may well conclude that a nonparent as to whom the biological parent has waived his or her superior custodial rights is entitled to consideration for custody if it is in the child's best interest, that is a significantly different determination from ruling that a biological parent is altogether precluded from obtaining any legal recognition of his or her genetic relationship to a child.

In sum, the trial court erred by concluding that Melinda and Boone were "equitably estopped from asserting that [Kelly] is not the legal father of the two minor girls." While, on the record before us, Kelly remains their legal father, there is no apparent bar to a paternity action seeking to establish Boone as their biological father.

### THE EFFECT OF WAIVER ON THE CUSTODY AND VISITATION RIGHTS OF THE BIOLOGICAL FATHER

 Finally, we address the trial court's summary dismissal of Boone's petition for custody or visitation. Clearly, the trial court may find from the evidence that Boone waived a biological parent's superior right to custody. Upon such a finding, the result would be to place Kelly, a nonparent who would otherwise have no equivalent right, on an equal footing with Melinda and Boone in matters concerning custody and visitation. Conversely, such a finding, though conveying standing on Kelly to seek custody and visitation, does not necessarily result in Boone's loss of his right to seek the same. As noted, once a non-biological parent is deemed to have standing to seek custody vis-a-vis the biological parents, the ultimate decision by the trial court as to who will be awarded physical custody of a child is dependent upon the best interests of that child. *Moore, supra. See also Greathouse, supra* at 390 (once determination is made that natural father has waived superior right to custody, physical custody is decided based on best interests of child). Thus, Boone's claim for custody and visitation should not have been summarily denied. We therefore reverse that portion of the trial court's judgment dismissing Boone's petition for custody or visitation and remand for further proceedings.

### MELINDA'S 401(k) RETIREMENT ACCOUNT

 Finally, we turn to Melinda's 401(k) retirement account. In its original Findings of Fact and Conclusions of Law Property Supplemental Decree, the trial court ruled that Kelly's Kentucky Teacher Retirement System (KTRS) account was fully exempt from division as marital property by KRS 161.700.[9] According to the trial court, Kelly's "entire KTRS account is to be excluded from the marital estate and therefore not considered for purposes of property division. The current state of the law does not protect [Melinda's] 401(k) from division as a marital asset. As a result [Melinda's] 401(k) shall be divided

---

9. KRS 161.700(2) provides:
 Retirement allowance, disability allowance, accumulated contributions, or any other benefit under the retirement system shall not be classified as marital property pursuant to KRS 403.190(1). Retirement allowance, disability allowance, accumulated contributions, or any other benefit under the retirement system shall not be considered as an economic circumstance during the division of marital property in an action for dissolution of marriage pursuant to KRS 403.190(1)(d).

equally...." While Melinda does not contest that KRS 161.700 mandates that Kelly's KTRS account cannot be divided as marital property, she contends that the trial court erred by not considering the effect of KRS 403.190(4) on the divisibility of her own 401(k) retirement account. In pertinent part, this statute states:

> If the retirement benefits of one spouse are excepted from classification as marital property, or not considered as an economic circumstance during the division of marital property, then the retirement benefits of the other spouse shall also be excepted, or not considered, as the case may be. However, the level of exception provided to the spouse with the greater retirement benefit shall not exceed the level of exception provided to the other spouse....

Melinda contends that pursuant to KRS 403.190(4) the trial court should have likewise exempted from division her own retirement account to the extent that the amount exempted does not exceed the value of Kelly's KTRS account.

Initially, there is some disagreement among the parties as to the precise issue on appeal. Based on Kelly's brief in this matter, he believes that Melinda seeks a judicial determination that the amount of Kelly's KTRS account that *exceeds* the value of Melinda's account is not exempt. Clearly, a plain reading of just KRS 403.190(4) would support such a contention. However, whether this provision applies when a KTRS account is at issue is unclear.[10] In our view, the clear, specific language of KRS 161.700(2) must prevail so as to exempt the *entire* amount of Kelly's KTRS account, even if that account is greater in value than Melinda's own 401(k) account. To hold otherwise would improperly elevate the more general language of KRS 403.190(4) in derogation of the well-settled rule of statutory construction that requires a more specific provision take precedence over a more general provision. *See, e.g., Commonwealth v. Phon,* 17 S.W.3d 106 (Ky.2000).

Despite this, we believe that the real issue raised by Melinda is not the degree to which Kelly's KTRS account is exempt from division, but rather the degree to which her own 401(k) account should be exempt from division. By application of KRS 161.700(2), Kelly's entire account is exempt. The amount to which Melinda's 401(k) account may be exempted is governed by the limitation found in KRS 403.190(4), *i.e.* her account is exempt up to an amount that does not exceed the value of Kelly's KTRS account. Moreover, Kelly's contention that KRS 403.190(4) has no application herein because his KTRS account is not to be considered an economic circumstance of the parties during the process of dividing their marital property is incorrect. By its plain language, KRS 403.190(4) applies even if the exempted retirement account of the other spouse "is not considered as an economic circumstance during the division of marital property...." The trial court's judgment on this issue is thus reversed and the matter remanded for disposition in accordance with this Opinion.

### CONCLUSION

In sum, although we disagree with the trial judge's legal conclusions on the difficult and novel issues which she faced, we recognize and commend the conscientious and judicious manner in which she handled an extraordinarily hard and troubling case.

---

**10.** This specific question is currently pending before the Kentucky Supreme Court in *Shown v. Shown,* Case No. 2005–SC–000855.

The best interests of the two young Ballinger girls were paramount in her handling of this matter and, indeed, those interests will be paramount on remand. If the trial court determines that Boone has waived the superior custodial rights ordinarily accorded a biological parent, she may consider Kelly as a custodian; if she does not find a waiver, only Boone and Melinda would be eligible for custody.[11] Accordingly, on the issues regarding the two young girls and for the reasons discussed above, we reverse the May 18, 2006 judgment of the Kenton Circuit Court and remand for further proceedings consistent with this Opinion. We also reverse the trial court's original Property Supplemental Decree to the extent that Melinda's 401(k) retirement account was not exempted from property division in accordance with KRS 403.190(4).

ALL CONCUR.

---

11. Again, our disposition hinges on what appears to be the inevitable result of a paternity action, but until such time as paternity is adjudicated Kelly remains the girls' legal father.