**IN THE COURT OF APPEALS OF IOWA**

No. 14-1325
Filed June 10, 2015

**STEVEN M. VOKAL,**
　　　Petitioner-Appellee,

**vs.**

**NICOLE FRIESS SCHILLING,**
　　　Respondent-Appellant.

_____

　　　Appeal from the Iowa District Court for Greene County, Thomas J. Bice, Judge.


　　　Nicole Schilling appeals the district court's decree disestablishing the paternity of the deceased legal father and establishing the paternity of the biological father to the minor child. **REVERSED.**


　　　Vicki R. Copeland of Wilcox, Polking, Gerken, Schwarzkopf, Copeland & Williams, P.C., Jefferson, for appellant.

　　　Sara E. Dewein of Cunningham & Kelso, P.L.C., Urbandale, for appellee.


　　　Heard by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, J.**

Nicole Schilling appeals the district court's decree disestablishing the paternity of the deceased legal father, Chris Schilling, and establishing the paternity of the biological father, Steven Vokal, to the minor child E.S.; and ordering visitation for Steven. Nicole claims the district court failed by not considering her motion to terminate Steven's parental rights on its merits, by disestablishing Chris's parental rights and establishing Steven's parental rights, and by not considering the best interests of E.S. in ordering visitation. Nicole also asks for appellate attorney fees. We find Steven did not assume "a serious and timely expression of a meaningful desire to establish" parental responsibility of E.S. and has thus waived his parental rights to E.S. We reverse the district court's decree.

## I.    BACKGROUND FACTS AND PROCEEDINGS

In the spring of 2003, Steven Vokal and Nicole Schilling met while they were both performing as cast members in a musical production in Omaha, Nebraska. A physical relationship began in April and ended in May. During this time, Nicole was married to Chris Schilling, though their relationship was estranged. In the months following her relationship with Steven, Nicole began to experience symptoms she assumed evidenced a relapse of cancer from which she had previously suffered. Nicole later found out she was actually pregnant.

At trial Steven and Nicole offered differing accounts of their conversations concerning the parentage of the child, E.S. Nicole testified Steven called her to see how a doctor's appointment had gone, and to see if she would return to

Omaha for another singing engagement. She responded, "I told him then that, um, good and bad. Good, I don't have cancer; bad news, I'm pregnant." Steven asked if the child was his and Nicole stated, "I don't know. I hope not." Nicole denies she ever considered or told Steven she was going to terminate the pregnancy. Prior to the birth, Nicole testified her last encounter with Steven was at the end of the summer of 2003. She told him she "did not want to see him; and that was that." Nicole further testified Steven contacted her after she gave birth, but Nicole "asked him not to contact me and he didn't contact me again." Finally, she testified she was certain Steven knew there was a possibility E.S. was his child.

Steven offered a different version of his conversations with Nicole. Steven testified he asked Nicole if the child was his and she responded the doctors told her "it was best for her to have a D and C so the pregnancy was terminated; and she stated she didn't know if the child was mine or Chris's." Based on what Nicole told Steven, he assumed she had terminated the pregnancy in the early summer of 2003. In the spring of 2004, Steven testified he heard through mutual friends Nicole had given birth. Steven called Nicole to inquire about the infant. Nicole told him she had given birth in February 2004, "she stated once again, that, uh, that the pregnancy had been terminated and she had allowed herself to become pregnant the following month." Steven stated Nicole asked him to stop contacting her as she had decided to stay with Chris.

Nicole and Chris resolved their marital issues and began living together again. Chris accepted E.S. as his own child. When confronted with the fact E.S.

might not be his child Chris replied "we are not going to talk about this again." E.S. has never been told there was a possibility Chris was not her biological father.

In 2009, Chris was diagnosed with cancer. He underwent multiple surgeries and chemotherapy treatments. After a long battle with cancer, Chris passed away in August 2011.

In February 2011, seven years since they last spoke, Nicole sent Steven a "friend request" on Facebook because she was interested in seeing pictures of his child C.H., who had been born around the same time as E.S. After becoming Nicole's Facebook friend, Steven saw photos of E.S. on Nicole's Facebook page and noticed E.S. and C.H. were similar in appearance. At trial, he testified that when he first saw pictures of E.S. he thought "there could be possibility that she was my child." Steven and Nicole continued to communicate for the next six months, and they ultimately planned a visit in October. The day before the visit, Nicole sent Steven a message stating, "[h]ere's the honest truth—check out the pictures of [E.S.] in my photos and compare them to [C.H.]. Perhaps it's just a coincidence, one of those things, and I am seeing something that isn't there—but the resemblance kind of freaks me out." In October 2011, Steven visited Nicole's farm and brought C.H. Steven testified the visit was "fantastic," and C.H. and E.S. "completely bonded;" after the first visit he was "very suspect" that E.S. was his daughter. The day after the visit, Steven sent Nicole a message:

> Hey, I wanted to write you about Sunday. First of all thank you for letting [C.H] and I come up. I hope you enjoy the photos. It was pretty emotional to see you again and [E.S.] for the first time. It was good. She's so pretty and it's so cool that her and [C.H.] got

along so well. I hope they can become good friends. As far as myself, I'm around as much as you let me. (I promise I won't be annoying). I think the important thing at this point is to take it slow. Anyway, I am very impressed with how you raised your kids. They're so much fun. Hope you get some sleep tomorrow.

And Nicole replied:

The kids had a lot of fun. [E.S.] did mention today when we were looking at the pictures, that she and [C.H.] look a lot alike. (Did [C.H.] say anything?) I agreed. And that was the end of it. I agree that there is no reason to push anything—but do know, that I am completely open to your involvement as it seems right. I go-between thinking that anything going on in [E.S.'s] life (activities, behavior, anything, I guess) is absolutely none of your business, to wondering how much information directed your way would be too much for you. I don't know, guess; we shall figure it out. It was good to see you.

The second visit occurred in January 2012, and the parties met a few other times in 2012. Steven often brought his daughter C.H. on the visits. The visits went well for a time, but Nicole became uncomfortable with the arrangement when she perceived Steven was pressing for more contact with E.S. Nicole "cut-off" Steven's visits with E.S. in February 2013.

On July 30, 2014 (*seventeen months* after his last visit or contact with E.S.), Steven filed a petition to judicially establish paternity, custody, visitation, and support. Nicole filed several motions over the next few months, all of which were denied.[1] In January 2014, a genetic test confirmed Steven was the father of E.S. Nicole then filed a motion for termination/petition for termination of parental rights pursuant to Iowa Code section 600B.41A(6)(a) (2013), and

---

[1] Nicole filed a motion to dismiss Steven's petition and claimed he did not have standing to pursue the action to overcome paternity. Steven resisted and claimed the Iowa Supreme Court case *Callender v. Skiles*, 591 N.W.2d 182 (Iowa 1999), established his right to bring this petition. The district court agreed and denied Nicole's motion.

requested the district court dismiss Steven's petition to establish paternity. Steven resisted Nicole's motion. The district court denied Nicole's petition and found Nicole "cannot raise by motion a new cause of action for termination of parental rights in this proceeding."

A trial was held on July 23, 2014, and a decree was entered on July 24. The district court found it was in the best interest of E.S. to disestablish the paternity of Chris and establish Steven as her father. The court rejected Nicole's claims that Steven had waived his right to establish paternity by failing to make a timely expression of his desire to parent E.S., and reasoned:

> The facts as represented do not support [Nicole]'s arguments. It was [Nicole] who told [Steven] early on, when questioned about the parentage of E.S. and whether [Steven] was the father, that ". . . I hope not!" It was [Nicole] who, because of her marital situation, asked [Steven] to "leave me alone" and "don't call." It was [Nicole]'s attempt to obstruct the relationship between E.S. and [Steven], and not [Steven]'s "abandonment" of the child, that created this difficult situation. Further, it was not until, at the very earliest, 2011 when photos were exchanged showing E.S. that [Steven] developed a reasonable "suspicion" that E.S. was his child. This fact was not confirmed scientifically until DNA testing in January of 2014. Given these facts, as this Court SO FINDS, they do not support an argument suggesting "abandonment" on the part of [Steven]. Further, as the DNA testing conclusively establishes, [Steven] is in fact the biological father of E.S. and the Court SO FINDS.

Nicole now appeals from the district court's decree.

## II.    STANDARD OF REVIEW

Generally, our review of paternity actions under chapter 600B is for errors at law. *Callender*, 591 N.W.2d at 184. Additionally, we review de novo the waiver of parental rights as it involves a constitutional right. *Huisman v. Miedema*, 644 N.W.2d 321, 324 (Iowa 2002)

### III.  ANALYSIS

On appeal, Nicole raises three grounds on which she claims the district court erred: It failed to consider her motion to terminate Steven's parental rights on its merits, it erred in disestablishing Chris's paternity and establishing Steven's paternity, and the court erred in failing to consider the best interests of E.S.  Since we find the district court improperly disestablished Chris's paternity and established Steven's paternity, we limit our analysis to that issue as it is dispositive.

Concerning the disestablishment and establishment of paternity, Nicole claims the district court erred by failing to address the issue of Steven's standing as a threshold question and by finding Steven did not waive his right to challenge paternity.

In *Callender v. Skiles*, our supreme court recognized a putative father (to a child born into a marriage) had standing to challenge the child's paternity under the due process clause of the Iowa Constitution.  591 N.W.2d at 192.  The court found the putative father's "right can be lost by waiver, which may be the threshold question to consider before addressing paternity.  If the challenge is not a serious and timely expression of a meaningful desire to establish parenting responsibility, it may be lost."  *Id.*

In this case, the district court found Steven had standing to pursue his claim in its denial of Nicole's motion to dismiss.  The court reasoned questions remained concerning the opposing claims about E.S.'s birth, and Steven's reaction when he learned about his relation to E.S.  As the district court found,

"Steven is entitled to bring this action following the holding in *Callender v. Skiles* which struck down the statute elimination of putative fathers from those with standing to file suit."

Concerning Nicole's waiver claim, the district court found it failed due to Nicole's "attempt to obstruct the relationship between E.S" and Steven. A putative father avoids waiver by demonstrating "a serious and timely expression of a meaningful desire to establish parenting responsibility." *Id.* The father can accomplish this by making an "effort to exercise his parental rights, not his efforts to judicially enforce those rights." *Huisman*, 644 N.W.2d at 325. The district court found Steven made efforts in 2003 to determine if he was the father of Nicole's baby. Steven's and Nicole's testimonies conflict on whether Nicole told Steven she had terminated the pregnancy. Steven spoke with Nicole after the birth of E.S. and asked about E.S's. physical characteristics. Steven testified Nicole told him E.S. was Chris's child and she had given birth in February, and reiterated she had terminated the pregnancy that could have been caused by Steven. Nicole testified Steven made up the termination of the pregnancy story and that Steven had knowledge he could have been the father of the child. In its ruling for Steven, the district court seemingly found his testimony credible. The court found Steven developed a "reasonable suspicion" E.S. was his child after viewing pictures on Facebook.

However, our supreme court analyzed a similar circumstance in *Huisman*. *Id.* at 322. In *Huisman*, two individuals (Wesley and Karen) engaged in a nine-year affair while they were married to others. *Id.* The affair resulted in the birth

of a child (Mark). *Id.* After Mark was born, Karen told Wesley that Mark was his son. *Id.* Karen's husband eventually learned of the affair, but decided not to investigate further and to parent Mark as his own. *Id.* Wesley maintained a relationship with Mark as a "friend." *Id.* Wesley gave Mark "small presents" and visited him infrequently. *Id.* at 323. From July 1992 through March 1999, "Wesley did not provide any support for Mark in the form of housing, clothes, food or medical care." *Id.* Karen never asked for support and Wesley did not volunteer to make support payments. *Id.* During this same time, Wesley provided no physical care or supervision of Mark. *Id.* In March 1999, Karen began an affair with another man, moved out of the marital home, and filed for divorce. *Id.* Wesley's contact with Mark increased at this time. *Id.* Wesley provided some supervision to Mark and made $200 monthly support payments. *Id.* In October 1999, Karen asked Wesley to take a blood test to prove he was the biological father. *Id.* This prompted Wesley to see an attorney and initiate a paternity suit. *Id.* "Wesley claimed that he did not assert his parental rights [earlier] because he thought that eventually he, Karen and Mark would be together as a family and because Karen told him he had no legal rights regarding Mark." *Id.*

Our supreme court found Wesley had waived his right to parent Mark, and reasoned:

> [W]e agree with the district court that Wesley did not make adequate efforts to assume parental responsibility for Mark. Although he established a friendship with Mark, he made no attempt to exercise responsibility for Mark's care or custody. Not until Mark was seven years old did Wesley make regular child support payments; prior to that time, Wesley was satisfied to give

Mark small gifts and trinkets. When asked at the hearing about the arrangement Wesley had with Karen to simply be Mark's friend and not to reveal that he was Mark's father, Wesley responded, *"[E]ventually* he was going to be my son, but at the time he was very young and he lived at home with Larry and Karen and *Larry was his father,* so a little . . . four, five, six-year-old boy doesn't understand and so I was his friend, Wes." (Emphasis added.)

For more than seven years, Wesley was content to let another man raise a child that was possibly his own. He did so, not through a lack of success at asserting his parental rights, but because it served his own need to keep his affair with Mark's mother a secret. Wesley's actions in 1999 in paying support and in commencing this action were too late. The district court correctly found that he had waived his liberty interest in a parental relationship with Mark. Accordingly, Wesley has no enforceable right to assert in the present action and the case was properly dismissed.

*Id.* at 326

We find the reasoning in *Huisman* directly applicable to the facts in our case. Even if we give Steven the benefit of the doubt and assume he did not have any idea E.S. could possibly be his child until he viewed pictures of her in 2011, Steven has not done anything since 2011 to "assume parental responsibility" for E.S. *See id.* Like the father in *Huisman*, E.S. perceived Steven as just a family friend—a family friend who infrequently visited and did not provide any form of support. Additionally, Steven allowed at least seventeen months to pass between the time Nicole terminated visits with E.S. and the filing of the paternity suit. A biological father must "'come forward to participate in the rearing of his child," if a father fails to do so he waives his liberty interest in a parental relationship. *Id.* (citing *Lehr v. Robertson*, 463 U.S. 248, 261 (1983)).

We find Steven did not assume "a serious and timely expression of a meaningful desire to establish" parental responsibility of E.S. and has thus waived his parental rights to E.S.  We reverse the district court's decree.

## IV.    APPELLATE ATTORNEY FEES

Nicole asks for appellate attorney fees.  Iowa Code section 600B.26 allows this court to award the "prevailing party reasonable attorney fees."  Nicole has prevailed in this appeal; therefore we award her $1000 in appellate attorney fees.

**REVERSED.**