# Supreme Court of Kentucky

## 2007-SC-000175-MR

FINAL

DATE 10-23-08 E.A.Grow.H. D.C.

J.N.R. AND J.S.R.                                                     APPELLANTS


V.

ON REVIEW FROM COURT OF APPEALS
CASE NUMBER 2006-CA-002497
JEFFERSON CIRCUIT COURT NO. 06-CI-503734


HONORABLE JOSEPH O'REILLY, JUDGE,
JEFFERSON FAMILY COURT; AND
J.G.R., REAL PARTY IN INTEREST                                        APPELLEES


**OPINION OF THE COURT BY JUSTICE MINTON**

**<u>REVERSING AND REMANDING</u>**

The Court of Appeals denied relief to a wife and her husband who petitioned to prohibit the family court from adjudicating the paternity of a man who claimed to be the biological father of a baby born to the wife. On appeal, the principal issue is whether Kentucky's courts have jurisdiction to decide a man's claim of paternity of a child born to a woman who, at the time of the child's birth, was married to another man. We hold that Kentucky's paternity statutes do not grant subject-matter jurisdiction to our courts to determine paternity claims where, as here, there is no evidence or allegation that the marital relationship ceased ten months before the child's birth. Therefore, we conclude that the family court was attempting to proceed without jurisdiction and that the Court of Appeals erred when it failed to grant the writ of prohibition.

# I. FACTS.

J.G.R. filed a Petition for Custody and Support in the family court, alleging that DNA tests confirmed him to be the biological father of J.A.R (Child), a three-month-old baby boy, who lived with his mother, J.N.R. (Wife).

Wife moved to dismiss the petition, arguing that J.G.R. lacked standing to bring it and that the family court had no jurisdiction to determine (1) custody of Child because J.G.R. had not been lawfully adjudicated to be his father and (2) paternity of Child because Child was not born out of wedlock since Wife was married to J.S.R. (Husband) when Child was born and at the time the petition was filed. Wife further asserted the continued vitality of the legal presumption that a child born to a married woman is presumed to be the child of her husband. She argued that the presumption could not be rebutted by "a stranger to the marriage." The family court refused to dismiss J.G.R.'s petition.

Wife and Husband then sought a writ from the Court of Appeals to prohibit the family court from proceeding on J.G.R.'s claims.[1] The Court of Appeals denied the writ, holding that Wife and Husband failed to show irreparable injury and lack of adequate remedy by appeal. The Court of Appeals further stated that "the only decision made by the [family] court pertaining to J.G.R.'s petition is that it will go forward on the paternity docket" and noted the family court had not made any rulings adjudicating any claims.

---

[1]    Husband and Wife had also requested a writ of prohibition forbidding the family court from ordering mediation regarding holiday visitation with Child. The Court of Appeals granted this request for relief, and the Court of Appeals' decision in regard to court-ordered mediation concerning holiday visitation is not a subject of this appeal.

## II. ANALYSIS.

### A. Court of Appeals Applied Wrong Standard to Writ of Prohibition Issue.

The Court of Appeals denied the writ of prohibition based upon Wife and Husband's failure to show irreparable injury and lack of adequate remedy by appeal. If the Wife and Husband had alleged only that the family court was acting erroneously *within* its jurisdiction, a showing of irreparable injury and lack of adequate remedy by appeal would have been required for the writ to issue.[2] But recent case law has made clear that a showing of irreparable injury and lack of adequate remedy by appeal is not required for issuance of a writ of prohibition when the trial court is acting *outside* its jurisdiction.[3] A court vested with supervisory control should grant a writ of prohibition when the lower court is acting outside its jurisdiction and "there is no remedy through an application to an intermediate court." Despite Wife and Husband's arguments that the family court lacked jurisdiction to hear the case, the Court of Appeals denied the writ on the erroneous grounds of Wife and Husband's failure to show irreparable injury and lack of adequate remedy by appeal. The Court of Appeals failed to analyze whether the family court had jurisdiction to hear and decide J.G.R.'s petition.

### B. Family Court Lacked Subject-Matter Jurisdiction to Hear Case.

Since personal jurisdiction is not at issue, we focus on whether the family court had subject-matter jurisdiction over this case. Subject-matter jurisdiction is defined as

---

[2] Hoskins v. Maricle, 150 S.W.3d 1, 10 (Ky. 2004).

[3] *Id.* ("A writ of prohibition *may* be granted upon a showing that (1) the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2) that the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.")

"[j]urisdiction over the nature of the case and the type of relief sought[,] the extent to which a court can rule on the conduct of persons or the status of things."[4] From the outset, Wife and Husband have disputed the family court's subject-matter jurisdiction to accept a petition in which the alleged biological father of a child, born to a woman who is married to another man, seeks to establish paternity, custody, support, and visitation of the child.

We must look to our statutes to see whether our trial courts have been granted subject-matter jurisdiction over a case like this one. We do not explore whether our statutes conferring subject-matter jurisdiction effectuate sound public policy, reflect the modern realities of DNA testing, or recognize the disappearance of ancient legal disabilities associated with being born out of wedlock. And we do not address the constitutionality of the statutes as written. Although the parties have debated whether an unmarried biological father has due process or equal protection rights to seek the relief J.G.R. seeks here, J.G.R. has not argued the unconstitutionality of the paternity statutes as written nor served Kentucky's Attorney General to challenge the constitutionality of any statute.[5] So we are left to examine the words of our statutes to

---

[4]   BLACK'S LAW DICTIONARY (8th ed. 2004).

[5]   KRS 418.075 states, in pertinent part, that:

When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.

(1)   In any proceeding which involves the validity of a statute, the Attorney General of the state shall, before judgment is entered, be served with a copy of the petition, and shall be entitled to be heard, and if the ordinance or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the petition and be entitled to be heard.

(2)   In any appeal to the Kentucky Court of Appeals or Supreme Court or the federal appellate courts in any forum which involves the constitutional validity of a statute, the Attorney General shall, before the filing of the appellant's brief, be served with a copy

4

see whether the family court had jurisdiction to hear and adjudicate J.N.R.'s paternity petition.

## C. No Subject-Matter Jurisdiction Over This Case Under KRS Chapter 406.

Subject-matter jurisdiction over paternity proceedings for all of our trial courts is governed by Kentucky Revised Statutes (KRS) Chapter 406, also known as the Uniform Act on Paternity.[6] KRS 406.051(1) provides the district court with subject-matter jurisdiction over "an action brought under this chapter" to establish support for "children born out of wedlock." KRS 406.051(2) states that the circuit court and district court share concurrent jurisdiction over custody and visitation issues "in cases where paternity is established as set forth in this chapter." And KRS 23A.100(2)(b) confers the general jurisdiction of the circuit court on a family court division of the circuit court for proceedings under the Uniform Act on Paternity.

Despite the fact that KRS 406.021 states that a paternity complaint may be filed by a "putative father,"[7] a term not defined in KRS Chapter 406, the instant case is not an

---

of the pleading, paper, or other documents which initiate the appeal in the appellate forum. This notice shall specify the challenged statute and the nature of the alleged constitutional defect.

See also Kentucky Rules of Civil Procedure (CR) 24.03 ("When the constitutionality of an act of the General Assembly affecting the public interest is drawn into question in any action, the movant shall serve a copy of the pleading, motion or other paper first raising the challenge upon the Attorney General.").

[6] KRS 406.170 ("This chapter may be cited as the Uniform Act on Paternity.").

[7] An earlier version of KRS 406.021 did not mention any type of father as a potential candidate for filing a paternity complaint despite expressly providing that the mother, child, or state agency providing support for the child could file such a paternity complaint. Under this earlier version, we stated that "[t]he statute does not afford the father the right to come into court to have his paternity determined" in Sweat v. Turner, 547 S.W.2d 435, 436 (Ky. 1977). But Sweat recognized the right of the biological father to seek custody of his child (born to an unmarried mother who had since passed away) without a previous judicial determination of paternity. Id. at 437. In Cummins v. Cox, 799 S.W.2d 5 (Ky. 1990), while stating that "[t]here is no statutory means in this state by which an illegitimate father can legitimatize a child born out of wedlock without the direct and active cooperation of the

action "under this chapter"; and KRS 406.021 does not allow for paternity to be established because KRS Chapter 406 limits its applicability to cases of children "born out of wedlock" and establishes a definition of "born out of wedlock" that the facts of this case do not satisfy. KRS 406.180 (governing applicability of Chapter 406) states, in pertinent part, that "[t]his chapter applies to all cases of birth out of wedlock: (1) [w]here birth occurs within this state[.]" And KRS 406.011 defines who is included and who is not included in the term "born out of wedlock:"

> A child born during lawful wedlock, or within ten (10) months thereafter, is presumed to be the child of the husband and wife. However, a child born out of wedlock includes a child born to a married woman by a man other than her husband where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child.

We note that the General Assembly chose to enact a narrow definition of an out-of-wedlock birth that differs distinctively from the proposed definition of an out-of-wedlock birth proposed by the drafters in the 1960 Uniform Act on Paternity. Section 1 of the Uniform Act on Paternity (1960) states that: "[a] child born out of wedlock includes a child born to a married woman by a man other than her husband."[8] The official commentary to this section mentions Kentucky's variation from the Uniform Act draft.[9]

---

mother", *id.* at 6-7, we noted in a footnote that KRS 406.021 had been amended in 1990 to allow a putative father to file a paternity complaint. *Id.* at 7, n.1. <u>Cummins</u> recognized that the biological father of a child born to an unmarried mother had standing to sue for the child's wrongful death and could inherit from this child born out of wedlock. *Id.* at 7. The children at issue in <u>Sweat</u> and <u>Cummins</u> were born to mothers who were unmarried at the time of conception and birth, and we did not consider in either case the rights of an alleged biological father to file a paternity complaint concerning a child born to a mother married to another man.

[8] Unif. Act on Paternity § 1 (1960), ULA PATERNITY § 1 (2001 Main Volume, 2007 Electronic Pocket Part Update).

[9] *Id.*

By the plain language of Chapter 406, that chapter only applies to births out of wedlock. And it defines births out of wedlock as including births to married women where evidence shows that the husband and wife's "marital relationship" ceased ten months before the child's birth.[10] In the instant case, we have no allegation that Wife and Husband's marital relationship had ceased ten months before Child's birth. So Child does not meet the statutory definition of a child born out of wedlock, and Chapter 406 does not grant the family court subject-matter jurisdiction or give J.G.R. standing to seek a paternity determination under Chapter 406.[11]

We recognize that the Court of Appeals rejected an argument in Montgomery v. McCracken[12] that "a child born to a married woman can be found to have been born out of wedlock *only* if the spouses' marital relationship ended at least ten months prior to the child's birth."[13] But the holding in Montgomery depended in large part upon the effect of a non-appealed judicial finding from an earlier divorce proceeding to the effect that the woman's husband was not the father of the child:

> Here, although the spouses' marital relationship did not fall into the category of having ceased ten months prior to the child's birth, it is uncontroverted that the husband was found in an earlier circuit court proceeding to not be the child's father. That finding is not before us on appeal. That being so, the trial court certainly did not err by concluding that the presumption of legitimacy had been overcome by evidence "so

---

[10] KRS 406.011.

[11] We note that our predecessor-court recognized that "a biological father of a child born out of wedlock would have the right of visitation with his child" on constitutional grounds in Phillips v. Horlander, 535 S.W.2d 72, 74 (Ky. 1975). But the child at issue there met KRS Chapter 406's definition of a child born out of wedlock because his parents were unmarried both at the time of the birth and at the time the court heard the case. *See id.* at 73. Again, the child at issue in the instant case is not a "child born out of wedlock" as defined by KRS Chapter 406.

[12] 802 S.W.2d 943 (Ky.App. 1990).

[13] *Id.* at 944.

clear, distinct and convincing as to remove the question from the realm of reasonable doubt."[14]

The Montgomery court then cited in support of this proposition two cases in which the husband's paternity was successfully challenged despite the mother having been married at the time of the child's birth.[15] But, in both of the cases cited, some evidence (albeit disputed) was presented that marital relations ceased ten months before the child's birth—in fact, both cases involved the separation of the spouses.[16]

The Montgomery court then stated that subject-matter jurisdiction to determine paternity upon the mother's motion was proper because of the overwhelming proof that the husband was not the father of the child:

> Since the child therefore by implication was found by the circuit court to have been "born out of wedlock" to "a married woman by a man other than her husband," the district court was clearly vested with subject matter jurisdiction to determine paternity.[17]

To the extent that Montgomery v. McCracken and other Kentucky cases find subject-matter jurisdiction to exist in any court of the Commonwealth over paternity actions involving (1) a child born "to a married woman by a man other than her husband" who cannot satisfy (2) the narrow definition embraced by the General Assembly that a child born out wedlock includes one where the husband and wife ceased marital relations ten

---

[14] *Id.*

[15] *Id., citing* Simmons v. Simmons, 479 S.W.2d 585, 587 (Ky. 1972); Bartlett v. Com. ex rel. Calloway, 705 S.W.2d 470 (Ky. 1986).

[16] *See* Simmons, 479 S.W.2d at 586 ("The wife contends and the husband denies that they engaged in sexual relations during their separation[,]" which occurred ten months before the child's birth); Bartlett, 705 S.W.2d at 471 (conflicting testimony as to when spouses separated and whether they engaged in sexual relations during their separation.).

[17] Montgomery, 802 S.W.2d at 944.

months before the child's birth, <u>Montgomery v. McCracken</u> and other authority to the contrary are overruled.

<u>Montgomery v. McCracken</u> is inconsistent with the earlier holding in <u>Department of Economic Security v. Shanklin</u>.[18] In <u>Shanklin</u>, a state agency sought to recoup support payments made for a child born eight months after her mother's divorce from Shanklin. Shanklin filed a motion to dismiss the action, stating that the action was time-barred, citing the then-existing statute of limitations appearing in Chapter 406 for support of a child born out of wedlock. The trial court granted Shanklin's motion.[19] Our predecessor-court quoted the presumption of legitimacy in KRS 406.011, as well as the language of KRS 406.180—neither of which has been amended since <u>Shanklin</u>[20]—and then reversed, stating that:

> The Uniform Act on Paternity was formulated in 1960. The Kentucky Legislature, by a 1972 amendment, varied the language of the 1960 Uniform Act in two instances: (1) In defining what was meant by the phrase "born out of wedlock" by adopting the language of KRS 406.011, and (b) by substituting for a four-year statute of limitations contained in the 1960 Uniform Act, the language of KRS 406.031. [Omitted portion discusses how legislature tried to remedy uncertainty in 1960 Uniform Act limitations provision through adoption of KRS 406.031.]

> We would be less than candid if we did not point out that the language used for the clarification is surely no model of precision. According to KRS 406.011, a child born during lawful wedlock or within ten months thereafter, is presumed to be the child of the husband and wife. This is qualified by the provision that a child born out of wedlock includes a child born to a married woman by a man other than her husband where evidence shows that the marital relationship between the husband and wife ceased ten months prior to the birth of the child.

---

[18] 514 S.W.2d 682 (Ky. 1974).

[19] *Id.* at 683.

[20] *Id.* at 683-84.

Under the Uniform Reciprocal Enforcement of Support Act, [21] the issue of paternity may be raised by the defendant unless it has been previously judicially determined. It is our conclusion that, despite the confusing language, it was not the intent of the legislature to bar such action within three years of the date of birth of a child born with the presumption of legitimacy.[22]

In other words, the Shanklin court found Chapter 406 inapplicable to that case because the child at issue was not a child "born out of wedlock" as defined by KRS 406.011. Since the child was "born with the presumption of legitimacy," the father was not barred from disputing paternity by the limitations provision in Chapter 406; but the father could still dispute paternity because Chapter 407 (URESA) allowed him to challenge paternity so long as it had not been previously established in court. Likewise, in the instant case, the child was not born out of wedlock, as defined by Chapter 406, so Chapter 406 does not apply and does not confer subject-matter jurisdiction on the family court or standing on J.G.R. to have paternity determined and custody/visitation matters decided.

We recognize that the General Assembly may have chosen to bar paternity suits where there is no allegation of a cessation of marital relations for the ten-month period in part because of difficulties in accurately determining the biological father of a child at the time these statutes were enacted or amended to their present form. In view of modern DNA testing, the legislature might reasonably choose to amend the statutes again to recognize an alleged biological father's right to have paternity determined in court of a child born to a mother married to another man even where (as here) there is no evidence or allegation that marital relations ceased ten months before the child's

---

[21] The Uniform Reciprocal Enforcement of Support Act (URESA) was then and is now found in KRS Chapter 407.

[22] *Id.* at 684-85.

10

birth.[23] But the choice is a policy decision that belongs to the General Assembly. And since the General Assembly has not yet chosen to amend KRS Chapter 406 in such a manner, we are without authority to amend the law for them.

It is the absence of evidence or even allegations that the marital relationship between Wife and Husband ceased ten months before Child's birth that bars J.G.R.'s paternity action, not J.G.R.'s status as a "stranger to the marriage." We do not reach the Wife and Husband's argument that only parties to the marriage can challenge the presumption of legitimacy under KRS 406.011. We do note that the plain language of KRS 406.011 does not say *who* may challenge the presumption of legitimacy but only says *under what circumstances* a child born to a married woman can be considered a child born out of wedlock. In fact, if the required threshold is met, showing that marital relations ceased ten months before the birth of the child, it would seem possible that the alleged biological father may file a paternity complaint because KRS 406.021 specifically states that such a complaint may be filed by the "putative father." The term "putative father" is not defined by the statute, but it is defined by BLACK'S LAW DICTIONARY (8th ed. 2004) as "[t]he alleged biological father of a child born out of wedlock."

---

[23] J.G.R.'s counsel orally argued that there are "dueling presumptions" in KRS Chapter 406: the presumption in KRS 406.011 versus the presumption in KRS 406.111 (regarding an expert's conclusion as to paternity based on genetic testing). But the applicability of Chapter 406 is limited to cases in which children are born "out of wedlock." KRS Chapter 406.011 expressly defines when a child born to a married woman is included as a child born "out of wedlock"; KRS 406.111 does not expressly define the term "out of wedlock" and, thus, does not impact the applicability of Chapter 406. Rather, the child would have to be determined to be born "out of wedlock" under KRS 406.011 for the court to have the authority to order genetic testing under KRS 406.081 and to admit such test results in evidence under KRS 406.091(3) before applying the rebuttable presumption concerning expert conclusions on paternity based on genetic testing as found in KRS 406.111.

## D. No Subject Matter Jurisdiction Under KRS 403.270.

Not relying solely on Chapter 406, J.G.R. also contends that as a biological parent, he has standing to seek custody under KRS 403.270. KRS 403.270(2) provides that a court shall determine custody in the child's best interests and that "equal consideration shall be given to each parent." But nowhere in KRS Chapter 403 is the word "parent" defined.[24]

Furthermore, KRS 403.270 does not govern whether a court has subject-matter jurisdiction over custody proceedings in this type of case or whether an alleged biological father has standing to pursue custody or visitation in this situation. KRS Chapter 403 is entitled "Dissolution of Marriage—Child Custody." The statutes in Chapter 403 generally give courts of general jurisdiction the power to grant dissolutions

---

[24] *See also* Boone v. Ballinger, 228 S.W.3d 1, 12, n.7 (Ky.App. 2007) ("Unlike some states, Kentucky does not have statutory definitions that describe 'legal' fatherhood. The Termination of Parental Rights chapter, KRS Chapter 625, simply refers to 'biological parents' and the 'putative father.' The UAP, KRS Chapter 406, refers to 'father' and 'alleged father,' neither of which is defined. The Parent and Child chapter, KRS Chapter 405, refers to 'father' without definition. KRS Chapter 403, regarding Dissolution of Marriage-Child Custody, contains no definition of 'father.' Case law supports the conclusion that in cases such as this a child's legal father is the husband of the marriage into which the child was born unless a different paternity has been formally adjudicated.") (Boone addressed the question of whether, upon dissolution of a marriage, the wife and the biological father of two children born during her marriage to her husband were equitably estopped from asserting that the husband was not the legal father of these two children.).

We note that one other Kentucky family law-related statute (KRS 405.405) expressly adopts the definitions provided in KRS 205.710 (applicable to child support recovery actions in Public Assistance and Medicaid Assistance actions) as applicable to KRS 405.430-KRS 405.530 (administrative process for child support), which includes the following definition of parent:

(14) "Parent" means a biological or adoptive mother or father of a child born in wedlock or a father of a child born out of wedlock if paternity has been established in a judicial proceeding or in any manner consistent with the laws of this or any other state, whose child is entitled to support, pursuant to court order, statute, or administrative determination[.]

However, KRS Chapter 403 (governing custody) does not expressly adopt this or any other specific definition of parent.

12

and annulments of marriages and decrees of legal separation—in general, the power to terminate marriages.[25] As part of its jurisdiction to dissolve marriages, the family court may also divide property, order spousal maintenance, and order child support for any children born of the marriage.[26] Also, when granting a divorce, the trial court must determine the custody of children born to the marriage in accordance with the standards enunciated in KRS 403.270. But KRS 403.270 does not govern whether a trial court has subject-matter jurisdiction to determine custody of children in cases not involving a dissolution of marriage.

Where paternity has been established under Chapter 406, subject-matter jurisdiction regarding custody and visitation issues is governed by KRS 406.051, which states that:

> (1) The District Court has jurisdiction of an action brought under this chapter and all remedies for the enforcement of judgments for expenses of pregnancy and confinement for a wife or for education, necessary support, or funeral expenses for children born out of wedlock. An appeal may be had to the Circuit Court if prosecuted within sixty (60) days from the date of judgment. The court has continuing jurisdiction to modify or revoke a judgment for future education. All remedies under the uniform reciprocal enforcement of support act are available for enforcement of duties of support under this chapter.

> (2) The District Court may exercise jurisdiction, concurrent with that of the Circuit Court, to determine matters of child custody and visitation in cases where paternity is established as set forth in this chapter. The District Court, in making these determinations, shall utilize the provisions of KRS Chapter 403 relating to child custody and visitation. The District Court may decline jurisdiction if it finds the circumstances of any case require a level of proceedings more appropriate to the Circuit Court.

---

[25] *See, e.g.,* KRS 403.010, KRS 403.120, and KRS 403.140. KRS 403.041 and KRS 403.042 also grant the power to annul divorces and legal separations.

[26] *See generally* KRS 403.160 to KRS 403.250.

Although KRS 406.051 states that the same standards provided in Chapter 403 for divorce cases shall govern custody determinations conducted in conjunction with paternity proceedings, KRS 406.051 and Chapter 406 as a whole govern subject-matter jurisdiction in this type of case, not KRS 403.270 or any other provision of Chapter 403. So KRS 406.051(2) grants the district court and circuit court concurrent jurisdiction (and by implication, family court, which combines district and circuit court jurisdiction) over custody and visitation where paternity is determined under Chapter 406. But Chapter 406's applicability is expressly limited to cases of children "born out of wedlock," and Child does not meet the General Assembly's narrow definition of a child born out of wedlock.[27]

From the plain language of our statutes, we hold that J.G.R lacks standing and the family court lacks jurisdiction to determine paternity, custody, and visitation under the circumstances presented in this case.

---

[27] *But see* Denbow v. Harris, 583 A.2d 205 (Me. 1990), where the Supreme Judicial Court of Maine (Maine's highest court) held that a mother could maintain a paternity action against the alleged biological father despite the fact that the child was conceived during her marriage to another man and despite the Maine legislature's omission of the definition of a child born out of wedlock as found in the Uniform Act on Paternity (1960) while otherwise following this Uniform Act. *Id.* at 206-07. The Maine court rejected an argument that "the Maine Legislature intended to limit paternity actions to instances to where children were born to an unmarried woman," instead deciding that the legislature had simply left out "definitional surplusage" since an "out of wedlock" birth was commonly defined as "with the natural parents not married to each other." *Id.* at 207, *citing* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 2592 (1986). We note, however, that although Maine's legislature had omitted the 1960 Uniform Act draft definition of "out of wedlock," Maine's legislature did not substitute another narrower definition of "out of wedlock" as Kentucky's legislature did in KRS 406.011.

## III. CONCLUSION.

For the foregoing reasons, we reverse the decision of the Court of Appeals and remand the case to the Court of Appeals for issuance of a writ of prohibition consistent with this opinion.

All sitting. Lambert, C.J., concurs. Cunningham, J., concurs in result only by separate opinion in which Scott, J., joins. Scott, J., concurs in result only by separate opinion in which Cunningham, J., joins. Abramson, J., dissents by separate opinion in which Schroder, J., joins. Noble, J., dissents by separate opinion.

COUNSEL FOR APPELLANTS:

Charles E. Ricketts, Jr.
Ricketts & Platt, PLLC
Ridgeway Building
4055 Shelbyville Road
Louisville, KY 40207-3106

Louis I. Waterman
Fore, Miller & Schwartz
200 South Fifth Street
First Trust Centre, Suite 700 North
Louisville, KY 40202

COUNSEL FOR APPELLEE JOSEPH W. O'REILLY:

Honorable Joseph W. O'Reilly
Jefferson Family Court, Division 7
Judicial Center
700 West Jefferson Street
Louisville, KY 40202

COUNSEL FOR APPELLEE J.G.R., REAL PARTY IN INTEREST:

Troy D. DeMuth
John H. Helmers, Jr.
Helmers, DeMuth & Walton, PLC
429 W. Muhammad Ali Blvd.
200 Republic Bldg.
Louisville, KY 40202

# Supreme Court of Kentucky

## 2007-SC-000175-MR

J.N.R. AND J.S.R.          APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.          CASE NUMBER 2006-CA-002497
JEFFERSON CIRCUIT COURT NO. 06-CI-503734

HONORABLE JOSEPH O'REILLY, JUDGE,          APPELLEES
JEFFERSON FAMILY COURT; AND
J.G.R., REAL PARTY IN INTEREST

### OPINION BY JUSTICE CUNNINGHAM
### CONCURRING IN RESULT ONLY

I concur with Justice Scott's opinion in which he concurs in result only. I am also certain that Justice Scott joins me in commending the very well-written opinion of Justice Minton writing on behalf of the majority. Nor do I wish to disparage in any way the very ably stated dissents of Justices Abramson and Noble, whose opposing viewpoints I hold in high respect.

Unlike the reasoning of the majority, Justice Scott and I are both of the opinion that only parties to the marriage can challenge the presumption of legitimacy under KRS 406.011. We hold this view as being inherent with the long-standing legal status of marriage.

This case is about something much larger than statutory interpretation. This case is squarely about the legal status of marriage in the Commonwealth of Kentucky today.

Here, a married couple wishes to be left alone from the allegations of an interloper who wishes to assert a claim of fatherhood to a child born during the couple's marriage – a marriage which remains intact at this writing.

While the legal status of marriage in this early 21st century appears to be on life support, it is not dead.

As I consider a claim made by an interloper to a marriage, I must pause to consider what rights, protections, benefits, and privileges the matrimonial covenant afford to those joined together in a relationship sanctioned by law. Beginning with the well-meaning legislation of no-fault divorce in 1972, the law has diluted the legal status of marriage. With the adoption of no-fault divorce, this grand historical contract has lost its consideration. Further, in Hoye v. Hoye, 824 S.W.2d 422 (Ky. 1992), the Court eliminated the tort of intentional interference with the marital relation, also known as alienation of affections. This was done with a bow to the modernistic notions of morality. The Court reasoned that the innocent spouse was barred by the infidelity of the errant spouse from obtaining redress. With the abolition of the tort of alienation of affections, the innocent victim of betrayal has been left without recourse against the interloping adulterer. But not for the decision of the majority here today, a married couple, bound together in one accord, would be left without any ability to defend their marital relationship from the attacks of a third party interloper.[1] In Hoye, we struck the

---

[1] Were we to decide this case differently, any married couple with children would be subject to such a claim. Standing could not be limited only to those who possess DNA-test results before filing. Further, it has been suggested that frivolous claims could be dealt with through CR 11 sanctions. The interloper, in order to defend an allegation that the claim was frivolous, would be allowed to present evidence of the extramarital affair and his basis for making the claim. In short, we would be back to the very evidence we did away with when no-fault divorce was adopted.

lance from the hands of the offended partner to the marriage. Shall we now, as the dissent would have us do, divest the hapless of their shield as well?

Exactly what does the term "marriage" mean today in Kentucky? Incredibly, we are offered little, if any, guidance when we turn to statutory law. KRS 402.005 defines it as "the civil status, condition or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex."

This statute, enacted in 1998, was the result of the legislature's desire to outlaw marriage between members of the same sex. It was followed by a constitutional amendment adopting that public policy. While meeting that public policy purpose, it is otherwise totally without substance as far as defining marriage itself – except to say what it is not. The statutory scheme set out in KRS Chapter 402 is of a similar vein. It proclaims who may perform a valid marriage, and outlines the requirements for licensing. But license to do what? To marry. But what is marriage? Alas, we have come full circle once again and are left wanting for statutory light.

What constitutes "civil status" as mentioned in the statutory definition of marriage under KRS 402.005? What is a "condition or relation"? What are the "duties legally incumbent" upon the parties? More importantly, what does "united in law" mean? Where is the law defining those privileges, protections, and rights afforded a couple married under the statutory scheme set out in KRS Chapter 402? In short, this Court is cast upon a vast sea bereft of any statutory mooring.

Yet the making of a marriage is governed by lawful requirements that have a sealing affect upon this act of becoming "united in law." KRS 402.050 states who may solemnize the marriage. The term "solemnize" is defined as "to enter into (a marriage,

3

contract, etc.) by a formal act, usually before witnesses." See BLACK'S LAW DICTIONARY (8th ed. 2004). The statute states that marriage may be solemnized by the following: "ministers of the gospel or priests; justices and judges of the Court of Justice, county judges/executives, justices of the peace and fiscal court commissioners as authorized by the Governor or county judge/executive; and a religious society, if either party belongs to the society." See KRS 402.050. Likewise, the statutory scheme sets out licensing requirements that must be met. See KRS 402.080 to KRS 402.110. Clearly then, legal formalities are required before the Commonwealth affords a couple the status of being "united in law."

Yet, there is not any statutory guidance as to what "united in law" post ceremony means, nor is the definition of marriage expanded upon anywhere by legislative directive. Thus, absent any meaningful statutory direction, it falls upon the courts – in particular, this one – to determine what legal rights, protections, and immunities this ancient legal rite includes. For over one hundred years, this Court recognized that the marriage contract afforded either party redress from an interloper who invaded and disrupted the affectionate bond between the parties. Then, in one stroke of the pen, we abolished that right in Hoye. Here, we hold the line. We should state boldly that an interloper cannot simply ignore the existence of the marriage contract and assert a claim of fatherhood to a child born within the confines of the marital relationship. I conclude that the family court had no jurisdiction to hear the claim of a "stranger to the marriage" over the objection of the contracting pair.

The severely wounded institution of marriage in Kentucky surely protects the parties from unwanted interlopers claiming parenthood of a child conceived and born

4

during their coverture. If not, then I am left to wonder if marriage has any legal meaning at all. I believe that it does.

We all agree that the overriding concern in this case is the welfare of the child. When considering the integrity of marriage, as we do here, we are not only dealing with this particular child, but with all children born to married couples. Marriage is an institutional umbrella under whose shade the protection, support, and nurturing of children looms vital. This critical protection extends to the children born of the marriage, if not of the bodies of the marriage.

In Hoye, part of the same reasoning for abolishing the tort of alienation of affections also serves as a reason to deny an interloper standing to sue a married couple for parental rights to a child born during the couple's marriage. Said Justice Stephens, "Such suits invite abuse.... Not only is a defendant in these suits victim to vindictive or purely mercenary motives of the plaintiff, but such suits are likely to expose 'minor children of the marriage to one of their parent's extramarital activities, and may even require the children to testify to details of the family relationship in open court.'" 824 S.W. 2d at 427.

Just as this Court held in Hoye that it had the authority to abolish the cause of action of alienation of affections absent statutory direction to the contrary, I submit that in light of the absence of statutory guidance as to the rights and protections of a duly married couple, this Court has full power to find compelling reasons to likewise protect those critical elements of the marriage contract.

This is not the first time this Court has been called upon to flesh out the legal parameters of marriage. In 1973, two women applied to the Jefferson County Court Clerk's office for a marriage license. They were denied and their complaint ended up in

5

this state's highest court.  See Jones v. Hallahan, 501 S.W.2d 588 (Ky. 1973).  At that time, there was no statutory definition of marriage – not even the woefully ambiguous one we have today.  Commissioner Vance, speaking for a unanimous Court, stated that Kentucky statutes did not include a definition of marriage, and therefore it had to be defined according to "common usage."  501 S.W.2d at 589.  In other words, marriage was what this Court said it was.  And this Court said that marriage had to be between a man and a woman – twenty-five years before the legislature followed with codification of that rule.

Nine years before Hallahan, and without a statutory definition of marriage, the Court struck a significant blow for the protection of marriage in Board of Education of Harrodsburg v. Bentley, 383 S.W. 2d 677 (Ky. 1964).  A sixteen-year-old student at Harrodsburg High School married and was promptly booted from school.  She had violated a school board regulation requiring any student who married to withdraw from school, subject to being readmitted after one year with permission of the principal and under special conditions.  This Court invalidated both the rule and the dismissal as being an arbitrary infringement upon the marriage contract.  383 S.W. 2d at 680-81.  In essence, it barred the interloping school board from "punishing" the young citizen for entering into a marriage covenant.

Also, it is clear to me that the purpose of the legislative scheme set out in KRS Chapter 406 was a means to compel parents to take care of their children.  Adjudication of paternity is simply an essential prerequisite to the enforcement of that obligation.  It was never intended to be a separate proceeding for a putative father to pursue other goals.

In his separate concurring opinion, Justice Scott ably points to the litany of cases in other states which have held this view. Granted most, if not all, of those opinions are rooted in much stronger statutory authority than we have here. But the dearth of statutory treatment of the issue in this state only emphasizes the need for this Court to step into the void and give meaning to "united in law." It is clear that in the absence of statutory treatment of the matter, we are acting within our authority when we limit standing to bring claims for paternity under the circumstances before this Court. The United States Supreme Court has provided a strong salute to this proposition. In Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the Supreme Court of the United States confronted a factual situation very similar to the one we have before us. The nation's highest court stated that the California statute, which created a "conclusive" presumption that a child born to a married woman living with her husband is a child of the marriage, did not violate the substantive due process rights of the biological father who sought to demonstrate paternity. More pertinent to the question at hand, Justice Scalia noted that at the time of the opinion, four states had barred standing to interlopers to the marriage by judicial decisions rather than by statute. 491 U.S. at 126, 109 S.Ct. at 2343. Since that decision, in the absence of statutes directly or indirectly granting or limiting standing to dispute the presumption of legitimacy of children conceived or born during wedlock, some state courts have held that various persons lack standing to dispute the presumption of legitimacy of the children. Donald M. Zupanec, Annotation, *Who May Dispute Presumption of Legitimacy of Child Conceived or Born During Wedlock,* 90 A.L.R. 3d 1032 (1979).

There is certainly much logic in the excellent writing of the dissent of Justice Abramson. But this very important case goes well beyond the interpretations and

7

nuances of existing writings of the legislature. By diverting our attention from what rights and protections a married couple has in this state, we turn the focus away from what, I believe, is the main issue. We are selling the pasture to buy the horse. The dissent gives no heed to what is at the center of this controversy – that is, the marriage contract to which the Appellants are parties, and all the rights, privileges, protections, and immunities attached to this long-standing legal arrangement.

Furthermore, I respectfully and strenuously take issue with two points stated by Justice Abramson. First, I reject the notion that a "marriage" ceased to exist when a "third party entered the picture." To hold to this view would wreak havoc on the stability of what is considered to be the most endearing social contract of our civilization. Furthermore, Justice Abramson's dissent suggests that, by our decision today, we are turning our backs upon a "biological truth" and denying truth its rightful place in our deliberations. I strongly disagree.

The truth is a child was born during a couple's marriage. The truth is a third party claims parenthood of that child through an adulterous relationship with the child's mother. The truth is the couple remains married and wishes to raise the child born during their marriage – a child legally presumed to be the husband's under KRS 406.011 – without the interference of the interloper. This presumption is not new or unique to this case; it is applied equally to children born of marriages every day in the Commonwealth. After all, we have not reached the point where we require DNA-paternity testing on all children born in the Commonwealth. This is true because the legislature has adopted a public policy in the law that presumes a child born during a marriage is of that marriage. Further, this presumption is recognized as one of the strongest known to law. See Bartlett v. Com. ex. rel. Calloway, 705 S.W.2d 470, 472

8

(Ky. 1986). Clearly then, the "truth" as to who the biological father may be – a most personal and intimate matter – is neither our right nor our responsibility to proclaim in these circumstances.

I recognize that to a large degree this writing seeks the ideal, and that the real state of matrimony in Kentucky – a state whose divorce rate is higher than the national average – falls way below the pedestal upon which I place it. But I also believe we are better off as a people following those standards we hold aloft, rather than those which we trample under foot. The facts of this case have presented a most difficult dilemma for this Court. We are sharply divided on an emotionally charged question. It is vital to recognize that all of these divergent views are being expressed from minds and hearts with the best intentions. And I, for one, recognize that there is no simple answer to what we all hope is a unique situation. But how unique it is, or how common it may become, depends much on what we say and do here today. As long as marriage is on the books, it must mean something. And what it means should be proclaimed by this Court in forceful terms, so that the people of Kentucky may circumscribe their behavior accordingly. We are in need of a bold declaration that the marriage circle, even one with an errant partner, will be invaded at one's own legal risk.

It has been my sad discovery as a judge that in many of life's baffling and painful problems there are no sure solutions, only less disastrous choices. Therefore, it would seem to me that if one accepts the inequities of our decision – which the dissent predicts as real possibilities – they pale in comparison to the disastrous precedent we will be setting if that viewpoint holds. It seems to me that the "broader community" spoken of by Justice Abramson is best served in our society by holding fast and strengthening the mooring lines of marriage. The institution of marriage, slowly eroding

9

from modern day notions of morality and personal freedoms, has for centuries been the anchor of the family unit. It has been the rock in the shadow of which children are born, shaded, protected, and nurtured. If children are born during the marriage, absent any abuse or neglect, they should stay within that marriage for as long as both partners wish to remain married, and for as long as the married couple wishes to nurture them. They should stay within the shadow of the rock.

Therefore, I join Justice Scott in concurring with the majority in its result only.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2007-SC-000175-MR

J.N.R. AND J.S.R.                                                                APPELLANTS


V.

ON REVIEW FROM COURT OF APPEALS
CASE NUMBER 2006-CA-002497
JEFFERSON CIRCUIT COURT NO. 06-CI-503734


HONORABLE JOSEPH O'REILLY, JUDGE,
JEFFERSON FAMILY COURT; AND
J.G.R., REAL PARTY IN INTEREST                                        APPELLEES


## OPINION BY JUSTICE SCOTT

## CONCURRING IN RESULT ONLY

I concur in result only for the reason that I believe J.G.R.'s status as a "stranger to the marriage" is the fundamental reason for the legislative language in KRS 406.011. Thus, I believe that only the "parties to the marriage" can challenge the presumption of legitimacy under KRS 406.011. Indeed, the presumption is one of the strongest known to law, Tackett v. Tackett, 508 S.W.2d 790, 792 (Ky. 1974), and thus, the presumption is theirs alone to challenge.

Although we have yet to address the question directly, many other courts have. See Ex parte C.A.P., 683 So.2d 1010 (Ala. 1996) (petitioner lacked standing to bring action to have himself declared child's father, where child was conceived prior to, but born during mother's marriage to husband, thus making husband the presumed father); Lisa I. v. Superior Court, 133 Cal. App. 4th 605,

34 Cal. Rptr. 3d 927 (2005) (alleged biological father of child born out of wedlock lacked standing as presumed father under Family Code to pursue paternity action against mother, where child was conceived during mother's marriage while she was separated from her husband, child was born less than 300 days after her divorce became final, and child was being raised by mother and her ex-husband, who had welcomed child into his home and held child out as his own); Tijerino v. Estrella, 843 So.2d 984 (Fla. Dist. Ct. App. 2003) (holding that a putative father does not have standing to seek to establish paternity of a child, where the child was born into an intact marriage, and where the married woman and her husband object to the paternity action); Callender v. Skiles, 591 N.W.2d 182 (Iowa 1999) (refusing to recognize any separate equitable parenting principles which would give a person outside a marriage the right to establish paternity); D.B.S. ex rel. P.S. v. M.S., 20 Kan. App. 2d 438, 888 P.2d 875 (1995) (where child is born into extended marital family, putative father's opportunity of establishing relationship with child conflicts with similar opportunity of husband of the marriage and it is not unconstitutional for state to give categorical preference to the latter); In re Walter, 408 Mass. 584, 562 N.E.2d 474 (1990) (alleged biological father is precluded from challenging presumption that husband is father of child born to wife during marriage); B.H. v. K.D., 506 N.W.2d 368 (N.D. 1993) (man claiming to be father of child born during marriage of mother to another man lacked standing to rebut presumption of child's legitimacy); David V.R. v. Wanda J.D., 907 P.2d 1025 (Okla. 1995) (putative father was barred from disputing presumption of legitimacy of child he asserted was product of his extra-marital affair with mother, where child was born during marriage of mother and

2

her husband, and child was being reared by mother and her husband as member of their family); CW v. LV, 788 A.2d 1002 (Pa. Super. Ct. 2001) (third party should not be allowed to attack the integrity of a functioning marital unit when seeking to assert his own paternity as against the husband in an intact marriage); In re M.R.M., 807 S.W.2d 779 (Tex. App. 1991) (only husband or wife is entitled to deny husband's paternity of child who is subject of suit and who is born or conceived during marriage of parties); Pearson v. Pearson, 134 P.3d 173 (Utah Ct. App. 2006) (putative father of child who was born during wife's marriage lacked standing to challenge paternity of child).

Moreover, there is no constitutional right of a "stranger to the marriage" to assert paternity under such circumstances. See Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). An intact family deserves no less protection.

Cunningham, J., joins this opinion.

3

# Supreme Court of Kentucky

## 2007-SC-000175-MR

J.N.R. AND J.S.R.                                                    APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.                              CASE NUMBER 2006-CA-002497
JEFFERSON CIRCUIT COURT NO. 06-CI-503734

HONORABLE JOSEPH O'REILLY, JUDGE,
JEFFERSON FAMILY COURT; AND
J.G.R., REAL PARTY IN INTEREST                                      APPELLEES

## DISSENTING OPINION BY JUSTICE ABRAMSON

I respectfully and firmly dissent. J.G.R. is entitled under Kentucky law to pursue a paternity action, as both the trial court and Court of Appeals properly concluded when confronted with this difficult case. This Court errs grievously in holding otherwise.

The majority reasons that (1) Kentucky's Uniform Act on Paternity, KRS Chapter 406, applies only to children born out of wedlock (KRS 406.180); (2) young J.A.R was not born out of wedlock as defined in KRS 406.011; and, consequently, (3) J.G.R. cannot pursue a paternity action even though DNA testing allegedly establishes his biological connection and his conduct evinces a strong desire to truly be a father to the child. In my view, the majority errs in finding that J.A.R. was not born out of wedlock, misconstruing the phrase "where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child." Properly construed, KRS 406.011 applies to situations such as the one now confronting us and

expressly allows for J.G.R.'s paternity petition. Admittedly, some jurisdictions (including many of those cited to by Justice Scott in his concurring opinion) have laws that reflect the legislature's apparent desire to preserve a currently intact family, however previously fractured, at all costs, including ignoring the biological truth in matters of paternity. Kentucky is not one of those states. Moreover, as explained below, laws which allow for establishment of the biological truth as to the paternity of a child do far more to advance society's interest in preserving families than those which lock the courthouse doors to anyone but the mother and her husband.

KRS 406.021 (1) allows paternity to be determined "upon the complaint of the mother, putative father, child, person, or agency substantially contributing to the support of the child." The term "putative father" is not defined in KRS Chapter 406 but "putative" is defined as "generally considered or deemed such; reputed." WEBSTER'S NEW COLLEGE DICTIONARY (1997). Is the father of a child generally considered to be the man who provided half of the child's genetic makeup or the man married to the mother who gave birth to the child? While I believe the former is more generally considered the "father", reasonable minds could certainly differ on this issue. Regardless, it is apparent that KRS 406.021 (1) does not clearly rule in or rule out a petition by a man in J.G.R.'s position.[1]

KRS 406.180 does describe the general applicability of KRS Chapter 406 as follows:

> This chapter applies to all cases of birth out of wedlock:
>
> (1) Where birth occurs within this state;
>
> (2) When birth occurs out of this state at the time the

---

[1] As the majority notes, BLACK'S LAW DICTIONARY defines "putative father" as "[t]he alleged biological father of a child born out of wedlock." Under this definition, J.G.R. is a putative father.

2

mother is a resident of this state after June 18, 1964; or

(3) When birth occurs out of this state and at some time following the birth the mother becomes a resident of this state after June 18, 1964.

KRS 406.011 provides the only description of a birth "out of wedlock":

The father of a child which is or may be born out of wedlock is liable to the same extent as the father of a child born in wedlock, whether or not the child is born alive, for the reasonable expense of the mother's pregnancy and confinement and for the education, necessary support and funeral expenses of the child. A child born during lawful wedlock, or within ten (10) months thereafter, is presumed to be the child of the husband and wife. However, a child born out of wedlock includes a child born to a married woman by a man other than her husband *where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child.* (Emphasis supplied).

After citing these two provisions, the majority notes that Kentucky did not simply adopt section 1 of the Uniform Act on Paternity (1960) which states that: "a child born out of wedlock includes a child born to a married woman by a man other than her husband." In fact, Kentucky adopted that precise language and then added the phrase emphasized above. The majority believes that by doing so the Kentucky General Assembly chose a "distinctively" different definition for birth out of wedlock, *i.e.*, if the married couple had "marital relations" within ten months prior to the birth of a child, that child is not born out of wedlock but is a child of the marriage. Under this interpretation, a wife could have one sexual encounter with her husband in the ten months preceding her child's birth and have multiple sexual encounters with another man (or men) but the child would still be born in wedlock to the mother and the man named on her marriage certificate. This is not what our legislature intended.

KRS 406.011 does not speak to "marital relations", a polite reference to the

3

sexual aspect of marriage, but rather to the "marital relationship", that broader, more meaningful aspect of married life that clergy and judges speak of when joining two lives as one. A marital relationship has emotional, physical, social and, yes, moral dimensions and is characterized by a monogamous bond between the two parties to the relationship. The "marital relationship between the husband and wife" referenced in KRS 406.011 can certainly be said to "cease" when the wife is having sexual intercourse with another man. The "marriage" may still exist as a matter of law and "marital relations" (*i.e.*, sexual intercourse) may still occur between the husband and wife on occasion, or even with regularity, but the monogamous "marital relationship" on which our society is based "ceased" when that third party entered the picture. If we focus on the words actually used by the Kentucky General Assembly, "marital relationship", as opposed to substituting "marital relations" (and therefore sexual intercourse) as the operative concern, then it is apparent that a child born under the circumstances of this case is indeed born out of wedlock. This interpretation has the added advantage of comporting with common sense because few people would question that a child born to a married woman and a lover who is *not her husband* is indeed born out of wedlock.

If our General Assembly intended this interpretation, some might question why they bothered to add the phrase "where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child." Why did they not simply adopt the UPA's standard definition -- "a child born out of wedlock includes a child born to a married woman by a man other than her husband"? If the General Assembly had done so, any man claiming to be the father of a child could bring a petition and set in motion paternity testing and proceedings with little more than

4

a bare allegation. The language added by our legislature requires a preliminary showing of evidence that the marital relationship "ceased" in the relevant timeframe. In other words, the putative father must have some evidence to proffer that shows he is not merely on a fishing expedition or out to create havoc in a marriage. The evidence which would show a cessation of the marital relationship must inevitably be assessed on a case-by-case basis but it would undoubtedly encompass a situation where the putative father has had access to the child through cooperation by the mother and has secured DNA testing that establishes his biological fatherhood. There is no more telling proof that "the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child."

For those who believe that KRS 406.011 is just as readily susceptible to the interpretation advanced in the majority opinion and who believe that particular interpretation does more to advance the Commonwealth's interest in the integrity of the family, three points should be considered. First, how is the family strengthened when a mother can conceive a child outside of marriage and be assured that she alone knows the child's biological origins and can control their discovery? She can harbor this secret until divorce, revealing the truth at that juncture if it serves her purposes. *See, e.g.* Boone v. Ballinger, 228 S.W.3d 1 (Ky. App. 2007). With this interpretation, there are no societal disincentives to conceiving a child outside the bounds of her marriage. Construing "marital relationship" as the more encompassing monogamous relationship, on the other hand, leaves no doubt that if she engages in an extramarital affair, the man will have a legal right to claim a place in the child's life. Second, for those who think it places the child in an untenable position vis-à-vis his or her in-home father and perhaps other siblings, there are tens of thousands of blended families all across

5

Kentucky who deal with those types of issues daily. Many marriages include children who are "yours and mine" or "yours, mine and ours" and those families cope with weekend and summer visitation, shared holidays and other aspects of blended families. In situations such as the one in this case, the only variable is that the child or children who have a parent outside the home are the younger as opposed to the older children in the family residence. Third, knowing the truth about one's genetic background has both medical and psychological consequences. Is it appropriate to leave a child without such genetic knowledge that could be crucial in the course of his or her life in medical situations? As for the psychological component, it is commonplace that adoptive parents are encouraged to share with their children the fact of their adoption at an appropriate time. Why should children like J.A.R. not have a similar right to know? In short, hiding the truth does not support the integrity of the family or advance the best interests of the child.

Justice Scott's concurring opinion cites cases from several jurisdictions that similarly leave the biological father without recourse where the mother is married to another man. Each of these cases is decided as a matter of that individual state's law and none is binding on this Court. The United States Supreme Court has held that states may properly adopt presumptions and limit paternity actions as a matter of state law. Specifically, in Michael H. v. Gerald D., 491 U.S. 110, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1991), the Supreme Court held that a biological father's procedural and substantive due process rights were not violated by a California statute creating a conclusive presumption that a child born during a marriage was a child of the marriage. Only the husband or wife could challenge the presumption and, even then, only if the challenge was raised within two years of the child's birth. In this context, the Supreme

Court stated:

> Where . . . the child is born into an extant marital family,
> the natural father's unique opportunity (to develop a
> relationship with his offspring) conflicts with the similarly
> unique opportunity of the husband of the marriage; and
> it is not unconstitutional for the State to give categorical
> preference to the latter.

*Id.* at 129, 109 S. Ct. at 2333.

Thus, states can and do give clear "categorical preference" to the rights of the husband of the marriage. For example, in David V.R. v. Wanda J.D., 907 P.2d 1025 (Okl.1995), the Oklahoma statutory scheme provided that "all children born during wedlock are legitimate" and the presumption was irrebuttable except by the husband or wife or the descendant of one or both of them. In other states, there are several ways a man can be a "presumed father" and once a child has a presumed father under the statute, the issue of his or her paternity cannot be raised except by the mother, the presumed father, the child or an agency of the state if the child is receiving public assistance. *See, e.g.,* Ex parte C.A.P., W.H.P and A.C.P., 683 So. 2d 1010 (Ala. 1996).

Kentucky has not expressed a "categorical preference" for the interest of the husband to the marriage. Unlike states with presumptions that expressly state that only the husband or wife can challenge the "born during the marriage and therefore child of the marriage" presumption, KRS 406.011 does not preclude a challenge by parties outside the marriage. Indeed, such challenges have been allowed as evidenced by Montgomery v. McCracken, 802 S.W.2d 943 (1990), discussed in the majority opinion and Bartlett v. Commonwealth, 705 S.W.2d 470 (Ky.1986). In the latter case, a child born in May, 1975 was deemed not to be the child of his mother's marriage even

though she was married at the time of the birth. There was conflicting testimony about whether she and her husband were separated or in any type of marital relationship at the time the child was conceived but HLA testing established that another man was the father. The case was apparently brought by the Commonwealth to determine the child's real father.

> The mother's testimony, if believed, was sufficient to establish "that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child." KRS 406.011, *supra.* We need not decide whether the HLA testing standing alone would be sufficient to overcome the presumption of legitimacy and establish the appellant's paternity. Certainly, the HLA testing when corroborated by the evidence of access, the contribution toward support, and a similar genetic characteristic, is so overwhelming as to constitute proof beyond a reasonable doubt.
>
> By this opinion we acknowledge the importance of HLA blood testing in supplying evidence as necessary to overcome the presumption of legitimacy and the requirement of proof beyond a reasonable doubt. Truth and justice are irrevocably bound. They are Siamese twins sharing a single heart beat. Neither can survive very long without the other. When the advances of science serve to assist in the discovery of the truth, the law must accommodate them. The law cannot pick and choose when truth will prevail.

*Id.* at 472-73.

In <u>Montgomery</u> it appears the Commonwealth was again the moving party but it is also clear that the Court of Appeals concluded that a child could be deemed born out of wedlock even where the parties to the marriage had maintained "marital relations" if there was clear evidence the husband was not the child's father.

> Contrary to appellant's assertions, we are not persuaded that this provision indicates that a child born to a married woman can be found to have been born out of wedlock *only* if the spouses' marital relationship ended at least ten months prior to the child's birth. Here, although the spouses' marital

> relationship did not fall into the category of having ceased ten months prior to the child's birth, it is uncontroverted that the husband was found in an earlier circuit court proceeding to not be the child's father. That finding is not before us on appeal. That being so, the trial court certainly did not err by concluding that the presumption of legitimacy had been overcome by evidence "so clear, distinct and convincing as to remove the question from the realm of reasonable doubt." *See Simmons v. Simmons,* Ky., 479 S.W.2d 585, 587 (1972).

802 S.W.2d at 944 (emphasis in original). The majority, in my view, errs in overruling cases such as <u>Montgomery</u> which allow rebuttal of the presumption.

Finally and notably, many states have dealt with parentage in cases such as this one by adopting the Uniform Parentage Act. The 2000 version of the Uniform Parentage Act would allow standing to a man in J.G.R.'s position provided he sought adjudication of parentage not later than two years after the child's birth. *See,* § 607 Uniform Parentage Act (2000). The commentary to § 607 reflects the variance among states in dealing with the issue as of 2000 and the middle ground adopted in the Uniform Parentage Act:

> As of the year 2000, the right of an "outsider" to claim paternity of a child born to a married woman varies considerably among the States. Thirty-three States allow a man alleging himself to be the father of a child with a presumed father to rebut the marital presumption. Some States have granted this right through legislation, while in other States case law has recognized the alleged father's right to rebut the presumption and establish his paternity. In some States, there is both statutory and common law support for the standing of a man alleging himself to be the father to assert his paternity of a child born to a married woman. Finally, some States, such as California, absolutely bar a man from commencing a proceeding to establish his paternity if state law provides a statutory presumption of the paternity of another man, *see* West's Ann. Cal. Evid. Code § 621, upheld in <u>Michael H. and Victoria D. v. Gerald D.</u>, 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333 (1989).

9

> UPA (2000) attempts to establish a middle ground on these
> exceedingly complex issues. Subsection (a) establishes
> a two-year limitation for rebutting the presumption of
> paternity established under Section 204 if the mother and
> presumed father were cohabiting at the time of conception.
> The presumption of paternity may be attacked by the mother,
> the presumed father, or a third-party male during this limited
> period; thereafter, the presumption is immune from attack
> by any of those individuals.

9B Uniform Laws Annotated, § 607 Uniform Parentage Act (2000) at p. 342.

Certainly Kentucky's stance on this issue would be clearer and the issue of paternity would be fairly and finally adjudicated in a timely manner if the General Assembly simply adopted the 2000 version of the Uniform Parentage Act. Nonetheless, even without this model legislation, Kentucky law allows a paternity action to be filed by J.G.R. under the circumstances of this case.

In short, our world is full of inconvenient truths. We accomplish nothing for families, the broader community and our justice system when we deny those truths, especially when Kentucky law does not require that result. J.G.R. should be allowed to pursue a paternity action because J.A.R. was born out of wedlock, in both the common understanding of that term and as provided in KRS 406.011. The family court had jurisdiction and the Kentucky Court of Appeals was correct in denying the writ of prohibition.

Schroder, J., joins.

# Supreme Court of Kentucky

2007-SC-000175-MR

J.N.R. AND J.S.R.                                                              APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.                          CASE NUMBER 2006-CA-002497
JEFFERSON CIRCUIT COURT NO. 06-CI-503734

HONORABLE JOSEPH O'REILLY,
JUDGE, JEFFERSON FAMILY COURT;
AND J.G.R., REAL PARTY IN INTEREST                               APPELLEES

## DISSENTING OPINION BY JUSTICE NOBLE

Respectfully, I dissent.

The parties to this writ petition and the majority of this Court have confused a statutory element of proof as a requirement for standing. In the paternity chapter, standing must be determined pursuant to KRS 406.021. If a party has standing, then and only then, does the presumption statute, KRS 406.011, have relevance as setting forth certain elements of proof that must be established to rebut the presumption that a child born during a marriage is the child of the husband. Specifically, the one making the claim of paternity who is not a husband must establish that the child is born out of wedlock. One does not have to prove an element in order to have the right to plead it. The right to make a claim is a great deal broader than what one must prove to establish that claim.

Standing requires a personal interest, often referred to as a "substantial" interest in the subject matter of the suit, not a "mere expectancy." For this reason, substantiality

of an interest must be determined by its direct relationship to the claimant. Ashland v. Ashland F.O.P. # 3, 888 S.W.2d 667, 668 (Ky. 1994). "Standing to sue" means that a party has "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. . . ." Sierra Club v. Morton, 405 U.S. 727, 731, 92 S. Ct. 1361, 1364, 31 L. Ed. 2d 636 (1972). "Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court; it is the right to take the initial step that frames legal issues for ultimate adjudication by judge or jury." Black's Law Dictionary 1405 (6th ed. 1990). Further, standing must be viewed as the power to hear and decide cases, and "does not concern the ultimate merits of substantive claims involved in the action." Weiner v. Bank of King of Prussia, 358 F. Supp. 684 (E.D. Pa. 1973 ); see also Flast v. Cohen, 392 U.S. 83, 99-100, 88 S.Ct. 1942, 1952 (1968) (The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court and not on the issues he wishes to have adjudicated. . . . In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable."). A plaintiff must have "alleged such a personal stake in the outcome to ensure concrete adverseness." Black's Law Dictionary 1405 (6th ed. 1990).

In Kraus v. Kentucky State Senate, 872 S.W.2d 433, 439 (Ky. 1993), this Court opined, "We believe that standing to sue means that a party has a sufficient legal interest in an otherwise justiciable controversy to obtain some judicial decision in the controversy. As noted by the Court of Appeals, it is the right to take the initial step that frames legal issues for ultimate adjudication." Likewise, in Stevens v. Stevens, 798 S.W.2d 136, 139 (Ky. 1990), we stated, "The requirement of standing is satisfied if it can

2

be said that the plaintiff has a real and substantial interest in the subject matter of the litigation."

Beyond doubt, JGR has shown that in the Family Court case. He alleged that he was the father of the child and claimed that a genetic test proved this. This is a personal claim about his fatherhood showing a substantial interest in the controversy. He also cited KRS 406.051 as conferring jurisdiction, which specifically references children "born out of wedlock." "It is axiomatic that in such circumstances, every well-pleaded allegation of the complaint must be taken as true and construed in the light most favorable to the party against whom the motion is made." Gall v. Scroggy, 725 S.W.2d 867 (Ky.App. 1987). As Chief Justice Lambert wrote previously in City of Louisville v. Stock Yards Bank & Trust Co., 843 S.W.2d 327 (Ky. 1992),

> [I]t is neither the province of the trial court nor of this Court to consider whether Appellant may be able to prove its allegations or ultimately prevail. On review, this Court will confine itself to a determination of whether the matters alleged in the complaint establish appellant's standing to bring the action or whether it is without a "substantial interest" in the subject matter of the controversy.

Id. at 328 (citations omitted).

Because feelings about the issue of paternity and marriage run strong among the members of the Court, we have jumped over the hurdle of proper pleading and procedure to the evidentiary merits of this case when we have no business doing so. We, as an appellate court, even on writ procedures appealed from the Court of Appeals, are not finders of fact.

JGR filed the petition in this case under various statutory provisions, including KRS 403.150, the divorce statute, and the child custody statutes he references, KRS 403.400 and KRS 403.620 (the UCCJA), which have been repealed and replaced by the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). However, he

3

also alleged paternity court jurisdiction over this case by citing KRS 406.051, which specifically refers to "children born out of wedlock" and which incorporates the entire paternity chapter. He further specifically alleged, "Paternity has not yet been established, however, DNA test results confirm the paternity of the Petitioner."

The Motion to Dismiss which is the basis for this writ petition is framed around the issue of whether JGR has standing to bring this action. The Memorandum in Support states two standing issues: that JGR has no standing to seek custody and support; and that he has no standing to seek a determination of paternity. It should be noted, however, that this petition was filed in a Family Court jurisdiction. The guiding concept of Family Court is "One judge, one family." Both custody and paternity are included in Family Court subject matter jurisdiction. Consequently, all issues to be heard may be filed in one petition, as JGR did here.

As to JGR's custody and support claims, they clearly are premature. At the point of pleading, there was no legal determination that he is the father of the child, which is required as he was not married to the mother when the child was born. On the other hand, his right to proceed under the paternity statutes is ripe. If JGR were found to be the father under the paternity statutes, the Family Court could address the custody and support claims seriatum. In the Family Court jurisdictions, there is nothing inappropriate about pleading all possible claims in one petition. Indeed, it may be necessary to avoid res judicata.

This is but one example of evolving legal questions that arise when a new type of court is instituted. At present in Kentucky, Circuit Courts hear custody and support actions, District Courts hear paternity and dependency/neglect actions, and Family Courts hear all these areas. The paternity statutes allow District Courts to determine

4

custody and support in a paternity case. Of necessity, a petition in Family Court must cover all possible claims, though the various claims may be decided in the order required by law, which would clearly help avoid piecemeal litigation in Family Court jurisdictions. JGR's petition may be understood more clearly in this light.

Since standing is determined solely from the allegations of the petition, with all factual assertions taken as true and construed in the light most favorable to the party against whom a motion to dismiss is made, the only relevant question is whether JGR has alleged matters in the complaint sufficient to establish his standing in paternity, since his standing as to custody and support cannot ripen unless he is the legal father of the child. Whether he could prevail is <u>not</u> the question before us, and would indeed be impermissible fact-finding.

"In regard to pleadings, Kentucky has always followed the notice pleading theory which only requires a short and plain statement of claim demonstrating that relief is warranted and necessary." <u>Equitania Ins. Co. v. Slone & Garrett, P.S.C.</u>, 191 S.W.3d 552, 556 (Ky. 2006). In scrutinizing whether a pleading yields standing, "We no longer approach pleadings searching for a flaw, a technicality upon which to strike down a claim or defense, as was formerly the case at common law. Whereas the old common law demur searched the pleadings for a reason to dismiss, now a Motion to Dismiss is directed at the substance of the pleading." <u>Smith v. Isaacs</u>, 777 S.W.2d 915, 915 (Ky. 1989) (citations omitted). In <u>McCollum v. Garrett</u>, 880 S.W.2d 530 (Ky. 1994), this Court affirmed that the sufficiency of the pleadings should be resolved by a commonsense reading so as to do substantial justice. To that end, all that is necessary is that a pleading sufficiently <u>identify</u> the basis of the claim. <u>Natural Resources and Environmental Protection Cabinet v. Williams</u>, 768 S.W.2d 47, 51 (Ky. 1989).

Without addressing the fact that the pleadings alone must be considered to determine standing, JNR jumps straight to the evidentiary merits of the claim, as has the majority. In the paternity chapter, standing must be determined pursuant to KRS 406.021, which defines who may bring a paternity action and lists a "putative father." Cf. Moore v. Asente, 110 S.W.3d 336, 355-56 (Ky. 2003) (determining standing by reference to the statute announcing who may bring a custody action). "Putative father" is not defined in the statutes, but is defined in Black's Law Dictionary 1237 (6th ed. 1990) as "[t]he alleged or reputed father of a child born out of wedlock." JGR has alleged that he is the father of a child born out of wedlock in his jurisdictional claim, and specifically asserts his personal, substantial interest in the case. He thus has standing.

If a party has standing, then and only then, does KRS 406.011 require certain elements of proof that must be established to rebut the presumption that a child born during the marriage is the child of the husband. Obviously, the right to make a claim is a great deal broader than what one must prove to establish the claim. One does not have to prove an element of a claim to have the right to plead it. Discovery and subsequent motions can address the evidentiary sufficiency of the claim. Doing anything else is to "use standing to slam the courthouse door against plaintiffs who are entitled to full consideration of their claims on the merits." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 159, 90 S. Ct 838, 25 L.Ed.2d 192 (1970) (Brennan, J., Concurring in part and dissenting in part).

In saying that JGR must specifically plead that the child in question is a child "born out of wedlock," the majority is mistaken, because he clearly gave adequate notice of such by citing KRS 406.051. In saying that he lacks standing because he did not specifically plead that the marital relationship between the wife and husband ceased

6

ten months before the child's birth, the majority is requiring him to meet a standard of proof <u>before</u> he will be allowed to proceed. In saying that there is no evidence that the marital relationship ended ten months before the child's birth, this Court goes too far into the realm of advisory opinions. The stance of this case at the time the writ petition was filed is that no evidence of any kind had been admitted. The attachments to the writ pleadings and other supplements all go to evidentiary matters that are the province of the trial court, not an appellate court. Obviously, even if this Court takes the view that the pleadings are inadequate to establish standing, there is no evidence to consider and we should not be giving advisory opinions as to whether JGR could rebut the presumption.

I do not subscribe to the majority view that JGR's pleading is so inadequate that it fails to <u>identify</u> the basis of his claim, and would find that he has standing to bring his paternity claim. Clearly, JNR understood that JGR was seeking a paternity determination as the court motions and this writ proceeding demonstrate. While it may be true that in order to be adjudicated the father of the child, he must prove either that marital relations between the wife and husband ceased ten months prior to the birth of the child or provide other sufficient proof as was allowed in <u>Montgomery v. McCracken</u>, 802 S.W.2d 943 (Ky.App. 1991), where a putative father was nonetheless declared the father of a child even though the mother married another man seven months before the child's birth; and in <u>Bartlett v. Com. ex rel. Calloway</u>, 705 S.W.2d 470 (Ky. 1986), where the child was born during the marriage, but evidence of HLA testing, a similar genetic characteristic, providing support and other testimony was found sufficient to say that the putative father was the father, that is not relevant at this point in the proceedings. We do not know what that proof would be. These cases state the status of the law as to

7

access as it has been in Kentucky for over twenty years, and reflect as Justice Leibson wrote,

> Truth and justice are irrevocably bound. They are Siamese twins sharing a single heartbeat. Neither can survive very long without the other. When the advances of science serve to assist in the discovery of the truth, the law must accommodate them. The law can not pick and choose when truth will prevail.

Id. at 473. There is no need to reverse these common sense cases. Doing so is an affront to stare decisis, and is being done because the majority is addressing the propriety of proof rather than whether JGR has the right to offer it.

Certainly, we do not know what JGR might be able to produce as evidence. It is conceivable that the mother might confirm that marital relations had in fact ceased ten months prior to the birth of the child when called to the stand, despite what may have been said earlier or what is being said now. Other proof is apparently available, specifically DNA testing. JGR clearly has a due process right to at least be heard, because he has standing. We must not advise as to whether he could succeed.

Consequently, this case should be remanded to the trial court to allow JGR to proceed with the paternity action so that it may determine the sufficiency of his proof.